Robert O. Brink, J.
This is a decision following a trial before the court without a jury. The plaintiff, General Aniline and Film Corporation, hereinafter referred to as G.A.F., seeks injunctive relief and damages against the defendant, Frederick H. Frantz, a former employee, and Frantz Industries, Inc., a corporation organized by the defendant, Frantz.
*995 The cause of action involved is based on allegations of the illegal conversion and use of trade secrets belonging to G.A.F., in violation of the terms of a written agreement between G.A.F. and the defendant, Frantz. The plaintiff also contends that there is common-law liability independent of the contract liability.
The defendants contend that they have not used G.A.F. trade secrets; that the G.A.F. prototype did not contain trade secrets;that if trade secrets were ever involved, such trade secrets were released by G.A.F.; that G.A.F. is guilty of laches in not commencing litigation at an earlier date, and that G.A.F. had abandoned the electrostatic copier and any trade secrets existing in connection therewith.
Among its many manufacturing activities in 1957, and for several years prior thereto, G.A.F. maintained a plant division in Broome County near the City of Binghamton, known as the Ozalid Division. Through this plant, Gr.A.F. for several years, has been manufacturing and marketing office copying machines of various types. In the year 1957, a decision was made to commence a program of research and design involving a new type of office copying equipment utilizing principles of a process known as electrostatics or electrophotography. This science was developed at the R.C.A. Sarnoff Research Center at Princeton, New Jersey, and was revealed to the world in 1954. Thereafter R.C.A. gave demonstrations of the process and indicated its willingness to license the same for practical application by manufacturers who might be able to use it.
The process of electrophotography as applied to an office copying machine involves the insertion of an original document to be copied following which a copy is created on special paper with a zinc oxide covering. The zinc oxide surface of the copy paper is given an electrical charge following which a light image of the original is cast upon the charged copy paper by means of a lens and reflecting mirror. The exposed paper is then treated with a toner substance which may be either dry or liquid as a result of which small black particles of the toner are collected upon areas of the copy paper corresponding to the printed areas of the original, thereby producing a copy.
In 1957, the defendant, Frantz, who had formerly held the position of chief engineer in charge of all the engineering functions of the Ozalid Division of G.A.F., was relieved of his general duties and given the specific assignment of director of equipment research and development. After accepting this responsibility, Frantz undertook the direction, administration and control of all research and design in connection with the *996 electrostatic office copier project. In such capacity, he had access to and control of all plans, specifications, drawings, documents and materials pertaining to research.
Under an employment agreement with G.A.F., dated August 18, 1947 and a supplemental agreement dated January 1, 1956, the defendant, Frantz, agreed not to disclose or use, company secrets or confidential knowledge or information, both during and after his period of employment.
There is evidence that under Frantz ’ direction between 1957 and 1959 inclusive, G.A.F. expended over $180,000 on engineering research and development of the electrostatic copying-process.
In August of 1960, under the supervision of the defendant Frantz, G.A.F. engineers started designing and constructing a small “ one to one ” electrostatic office copier. By August of 1961, they had completed the first prototype. The project offered many unique problems. Early experiments had been conducted with the use of a dry toner. Representatives of G.A.F. went to Australia to investigate the use of a liquid toner. After a liquid toner was utilized, an ingenious method of floating the exposed copy face down in the developer was conceived by one Grouldsmith, a Gr.A.F. engineer. Prior to this development, the copies became abrazed by rubbing against the guides. Problems arose in devising an optical system which would operate properly in a small space and still maintain a straight-line path for the copy paper, as it was being transported from a roll automatically cut with a knife electrically charged with a corona, exposed to the original image, dried and ejected from the machine. Many other problems arose and were solved. Each step in the various processes was completed only after drawings and bread board models had been completed. In February, 1962, the experimental model had been completed and was functioning in a reliable manner. Additional expenditures for the specific machine totaled over $102,000. Before deciding to market the machine, it was determined to engage an outside consultant to attempt to reduce production costs and in March, 1962, “ Designers for Industry ”, later known as “ Booz Allen Applied Research Inc.” were engaged to productize the new copier. The consulting company in May, 1962, furnished a written report consisting of recommendations as to changes in design and a reduction in size by eliminating a lamp assembly. Attached to the report were pocket parts containing drawings.
Shortly thereafter, following recommendations of the commercial development department, a decision was made at the top level of GLA.F. not to place the office copier on the market.
*997 However, during 1962 and 1963, interest was shown in the model by representatives of certain manufacturers, namely, Smith-Corona and the Minolta Company, a Japanese concern. In April, 1963, a second consulting firm was engaged to evaluate the prototype. All evidence in the case points to the fact that throughout the creation, development and testing of the G.A.F. prototype, strict secrecy was maintained under the direction and supervision of the defendant, Frantz and his successors.
Frantz resigned on April 1, 1962, stating to his coemployees that he intended to go in business for himself. After leaving G.A.F., Frantz worked a few months for a concern known as Static Systems. In March, 1963, the defendant’s Frantz Industries Inc., was incorporated. Early in 1963, the defendant, Frantz, started contacting G.A.F. employees and former employees who had worked on the development of the G.A.F. prototype. He attempted to hire Donald Gouldsmith who contributed as much as anyone to the creation and development of the G.A.F. copier. He also approached Bichard Smith who made many of the G.A.F. drawings. He was not successful in persuading either of these men to come with him. However, he did succeed in obtaining Carl Ackerman, an engineer who had worked on the project and Lloyd Harrison, his former administrative assistant. Other former G.A.F. personnel, namely, Hazen Hunt, Charles De Gregorio and Nicholas Cihiwsky also went to work for the Frantz Corporation.
On May 1, 1963, operations were commenced by the defendant corporation in the development of an office copier. At the time work began, certain drawings had been prepared and by the end of the first month, the design of the first machine had been 65% completed. There is evidence that the first Frantz prototype was completed within three months from the day the company commenced operations.
Between that date and the month of May, 1964, employees of G.A.F. from time to time visited the Frantz plant for the purpose of selling paper which G.A.F. manufactured. Some of the employees in the commercial division of the industry saw the Frantz machine in operation but not being engineers, had no reason to make any technical appraisal of the operation of the Frantz machine.
In May, 1964, the Frantz 1100 Office Copier together with a cross-section drawing, was placed on public display at the Sheraton Tun in Binghamton. It is the plaintiff’s contention that at that time the executives and engineers of G.A.F. first realized that the Frantz 1100 was a copy of the G.A.F. prototype and was a product of G.A.F. trade secrets, which were known *998 to Frantz and certain of his employees who formerly worked for G.A.F.
This action was commenced on or about June 16, 1964, the month following the public showing of the Frantz 1100 Office Copier.
G-.A.F. executives and engineers have testified that commencing the latter part of 1964, and continuing through 1965, the G-.A.F. office copier program had been reactivated and this machine project was being developed in the G.A.F. engineering department at the time of trial in the Summer of 1965. It is also contended by the plaintiff that the existing electrostatic machine with some modifications, would satisfy the market for one of their proposed models.
This case was tried at various adjourned sessions of the court during the months of May, June and July, 1965. By reason of the illness of the court reporter, who produced a good record under a serious handicap, the case was not finally submitted to this court until April, 1966. The typewritten record is over 1,700 pages long and 487 exhibits were introduced in evidence. Extensive depositions were taken before trial and large portions of the examinations were read into the record. Twelve witnesses were sworn by the plaintiff and six by the defendants.
One fact is most apparent from this volume of evidence. The defendants, in designing and producing their office copier finally known as the Frantz 1100, used and copied the external and internal design, drawings, mechanical layout and configuration of the G-.A.F. prototype as redesigned by Designers for Industry. This finding is established by a comparison of the drawings of the first Frantz prototype and the Frantz 1100, with the drawings of the G-.A.F. prototype.
Later, minor modifications were made in the Frantz 1100 production model including changing the charging unit from a single to a double corona, changing the cooling system and certain style changes.
There is other substantial evidence pointing to the unescapable conclusion that Frantz copied the G-.A.F. machine. The first prototype of the Frantz copier was designed and substantially completed in three months. It is established by the evidence it would normally take two to three years to complete the drawings, bread boards of the parts and the necessary testing to produce this type of a mechanical device. From the very inception and organization of his company, Frantz showed great interest in inducing G-.A.F. engineers and technicians to join with him and in some instances was successful.
*999 There is evidence in the case that Frantz had access to certain G.A.F. drawings after he left G.A.F. and an expert testified that G.A.F. drawings were traced or copied in some early drawings of parts of Frantz’s machine. Lloyd Harrison was Frantz’s assistant at G.A.F. and continued in that capacity under Frantz’s successor. He later became an officer of Frantz Industries, Inc. Harrison’s car was identified by the witness Goodman parked at Frantz’s home 12 or 14 times during the month of March, 1963, while Harrison was still employed by G.A.F. The witness Smith testified that Harrison had copies of the Design for Industry Report. The witness Donald Rinker saw Frantz’s wife carrying rolled up drawings to Harrison’s office in the Spring of 1963. The witnesses Gouldsmith and Smith both testified to admissions by Frantz to the effect that he intended to copy the G.A.F. prototype. Frantz failed to take the stand and deny any of this testimony. Under these circumstances, this court finds that in designing the Frantz 1100, the defendants traced or copied G.A.F. drawings and used and copied the G.A.F. prototype.
In order to establish a cause of action it was necessary for the plaintiff to prove that the G.A.F. prototype was protected with secrecy at the time it was utilized by the defendants. Plaintiff’s expert, Meyer Sugarman, testified it was one of the best kept secrets in the industry. Practically all witnesses who were employed by G.A.F., including Frantz himself, testified as to the extreme caution that was used in preventing disclosure of any information about the G.A.F. prototype. There were occasions when representatives of other concerns viewed the machine for negotiating purposes, but even in these instances caution was exercised in not revealing the internal configuration of the prototype. The degree of secrecy that is required for a trade secret need not be absolute or 100% perfect. (Fairchild Engine & Airplane Corp. v. Cox, 50 N. Y. S. 2d 643, 653, 656-657 [1944]; Eastman Kodak Co. v. Reichenbach, 20 N. Y. S. 110, 112, 113, opn. in 79 Hun 186, affd. 79 Hun 183 [1894]; Board of Trade of City of Chicago v. Christie Grain & Stock Co., 198 U. S. 236, 250-251 [1905]. Restatement, Torts, § 757, Comment b, Secrecy.)
There is no evidence that G.A.F. ever communicated to Frantz that the veil of secrecy had been lifted and there is no evidence in the case to prove that this ever happened.
The only substantial issue in this case is the question as to whether the G.A.F. prototype involved trade secrets. The various ideas incorporated in the functioning parts of the machine were not generally unknown at the time the G.A.F. machine was *1000 conceived, designed and built. Some of them had been used in other copying machines not in the electrostatic field and others were in the process of development by competitors. However, much research and experiment went into the G.A.F. prototype — in improving and refining these operations. To mention some of them — floating the paper face down through liquid developer; using diehroic filter to control heat in the exposure area and designing the optical system so as to function in the smallest possible area. Much ingenuity was demonstrated by the G-.A.F. engineers in configurating these improved functional operations into a compact electrostatic office copier that worked. Although it was not marketed, there is ample evidence to establish that in frequent tests and demonstrations the machine operated efficiently.
This court is able to find that there was no electrostatic copier on the market in the Spring of 1963 that was as compact as the G.A.F. prototype, or which contained the identical improvements of some of the functioning parts or which had the same internal configuration.
It seems to this court that internal configuration of operating parts of a machine, when novel in design and unique in its field, in itself can be sufficient to constitute a trade secret; particularly when much research and experimentation is required to produce a finished working product.
The defendant Frantz recognized the novelty of the machine when on May 21, 1964, one year after he commenced operations, he filed a patent application for an electrostatic copier, representing he was the inventor. An examination of this patent application reveals a striking description of the G.A.F. prototype. In his application he claimed that with the exception of the corona and charging devices, the balance of the machine was novel.
On the testimony alone of plaintiff’s expert Sugarman and the witness Gouldsmith who had much to do with the design of the G.A.F. prototype, as against the testimony of the defense expert Van Auken, this court is convinced that the G.A.F. prototype involved trade secrets and so finds.
It seems that this case clearly falls within the definitions of trade secrets found in the Be statement of Torts (§ 757, Comment b): “ A trade secret may consist of any formula, pattern, device or compilation of information which is used in one’s business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, or pattern for a *1001 machine or other device, or a list of customers ” and section 1296 (subd. 4) of the Penal Law of the State of New York, which defines secret as: “A process, invention or formula is secret ’ when it is not, and is not intended to be available to anyone other than the owner thereof or selected persons having access thereto for limited purposes with his consent, and when it accords or may accord the owner an advantage over competitors or other persons who do not have knowledge or benefit thereof ” and Corpus Juris Secundum (vol. 43, Injunctions, § 148, subd. a, par. [1]).
As stated above, the secret need not be total nor need the plaintiff meet the stringent requirements necessary in the case of a patent application. (Restatement, Torts, § 757, Comment b.) As has been stated in one case, the field need not be virginal. (Fairchild Engine & Airplane Corp. v. Cox, supra, p. 657.) The reason for this is that the gravamen of this action is breach of confidence and the fact that at some later time after he violated his agreement and trust he could have obtained information elsewhere does not excuse his conduct. Protection is given against the reprehensible means, such as a breach of confidence, employed in gaining the secret. (Minnesota Min. & Mfg. Co. v. Technical Tape Corp., 23 Misc 2d 671, 683 [1959], affd. 15 A D 2d 960 [1962]; Fairchild Engine & Airplane Corp. v. Cox, supra, p. 656; Du Pont Powder Co. v. Masland, 244 U. S. 100, 102 [1917]; Restatement, Torts, § 757, Comment b.) Therefore, the fact that after Frantz started copying the G.A.F. machine, other machines came on the market does not relieve him from liability.
Defenses of laches and abandonment have been interposed. These defenses are untenable in this action. Although the machine was seen by employees of G.A.F. from time to time before its public showing, there is no credible proof that any executives or members of the engineering division of G.A.F. had any knowledge of the internal configurating of the Frantz 1100 before it was shown at the Sheraton in May, 1964. This action was commenced on or about June 16, 1964. There is no proof that the employees that saw the machine before that time had knowledge of sufficient facts or acquired knowledge of sufficient facts to put G-.A.F. on notice at an earlier date. Under these facts it seems apparent the plaintiff was not guilty of laches.
There is no proof that the plaintiff abandoned the trade secrets involved in its prototype. The fact that at a particular time the plaintiff did not consider it feasible to market the machine does not establish that it abandoned the trade secrets involved. No representative of the plaintiff ever told Frantz *1002 or anybody else that the machine was being discarded. In fact, during 1962 and 1963, negotiations were conducted with other companies relative to the sale or manufacture of the machine. The company took the position that at the time of the trial of this lawsuit the project was being revived. The prototype, including its secrets, was and still is G-.A.F. property as far as the defendants are concerned and there is no evidence to the contrary.
During the trial, machines and drawings of machines either designed or marketed subsequent to May, 1963 were introduced in evidence by the defendants over objection. The court reserved its ruling as to admissibility of this evidence. The court now rules that all of such evidence is received only on the question of damages and that it has no relevancy on the issues of liability.
The finding of this court is that in the design, manufacturing and marketing of the Frantz 1100, the defendants illegally misappropriated plaintiffs trade secrets. The trade secrets misappropriated are as follows:
1. The method of transporting exposed paper through the liquid developer.
2. Design and configuration of an optical system adaptable to a compact electrostatic office copying machine.
3. Design and configuration of functioning component parts of the machine so as to furnish a straight-line pattern for the copy paper through the various operations of the machine.
4. The use of a dichroic filter to control heat in the exposure area of the machine.
5. A lamp bousing system permitting absorption of infrared rays and utilization of heat for drying purposes.
6. Synchronization of original and copy paper handling sections in a compact office copier.
7. The use of a particular type of light source with parabolic reflector for use with the particular optical system employed.
8. The complete internal design and configuration of the machine.
9. The design, placement and combination of component parts resulting in a functioning and workable compact electrostatic copying machine.
10. Over-all size, compactness and exterior styling as a result of use of the aforesaid specified trade secrets.
Plaintiff is entitled to a judgment against the defendants affording the following relief:
1. A prohibitory injunction restraining the defendants from manufacturing, selling or distributing the Frantz 1100 electro *1003 static copying machine or any electrostatic copying machine which employs and utilizes any of the trade secrets of the plaintiff hereinbefore specified and from further using or disclosing any of such trade secrets.
2. A mandatory injunction requiring the defendants to deliver up to the plaintiff for destruction, all drawings, sketches, designs, patterns, tools, dies, jigs, models, machines, and parts thereof in any way relating to, or used in connection with, the Frantz 1100 machine, or any other electrostatic office copier, the design, style, arrangement or configuration of which employs or utilizes any of the plaintiff’s trade secrets hereinbefore specified.
3. A mandatory injunction requiring the defendants to assign to the plaintiff all of their right, title and interest in and to the patent application described in the plaintiff’s Exhibit 123.
It is the further decision of this court that the plaintiff should recover damages from the defendants, including punitive damages. The defendant Frantz and through him the defendant corporation willfully misappropriated trade secrets in violation of Frantz’s agreement. His undenied statement to the witness Donald G-ouldsmith that they (referring to G.A.F.) “have not sued anybody in 15 years and they are not going to sue me now,” indicates a willful and intentional breach of confidence and wanton disregard of the property rights of others.
Plaintiff’s counsel suggests punitive damages in the sum of $250,000, plaintiff’s investment in the machine. However, the actual value of the machine has never been tested in the market. This court feels that in assessing punitive damages, it should, in fairness, give some consideration to the fact that at the time the defendants utilized the trade secrets involved, the project was dormant. Furthermore, the competition in the field was opening up. Of course, this does not excuse the defendants, but it has some bearing on the gravity of the misappropriation.
Exemplary damages should be awarded to the plaintiff against the defendants in the sum of $50,000.
The plaintiff is also entitled to compensatory damages. The witness Cloney testified that it would cost $25,000 to $40,000 to redesign the machine. Such damages are speculative under the proof in this case.
The plaintiff is entitled to the fruits of the defendants’ misappropriations, namely, profits on the Frantz 1100 machines already marketed. This amount can only be determined on a further hearing.
The plaintiff is entitled to an interlocutory judgment affording the relief set forth, assessing the damages already fixed, namely, exemplary damages in the sum. of $50,000, and providing for a *1004 hearing for the purpose of determining compensatory damages. The determination of costs should await final judgment. The case is adjourned to a date to be fixed by conference, for a further hearing as to the amount of compensatory damages as hereinbefore provided.
Enforcement of the prohibitive and mandatory injunctions, provided herein, is stayed for 30 days from service of notice of entry of judgment on this decision. Execution on judgment for damages is stayed until final judgment is entered herein.