David S. SHERIDAN, Plaintiff,

v.

MALLINCKRODT, INC., Defendant.

MALLINCKRODT, INC., Third Party Plaintiff,

v.

SHERIDAN CATHETER CORPORATION, Third Party Defendant.

No. 79–CV–657.

United States District Court, N.D. New York.

June 30, 1983.

Hogan & Hartson, Washington, D.C., De-Graff, Foy, Conway, Holt-Harris & Mealey, Albany, N.Y., for plaintiff and third party defendant; John P. Arness, David J. Hensler, Washington, D.C., Michael J. Cunningham, Albany, N.Y., of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, Bernard, Rothwell & Brown, Washington, D.C., Harvey and Harvey, Mumford & Kingsley, Albany, N.Y., for defendant; Edwin E. McAmis, Samuel Kadet, New York City, G. Franklin Rothwell, Washington, D.C., Brian F. Mumford, Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This action arises out of an employment relationship between plaintiff and defendant, as well as the sale to defendant by plaintiff of a manufacturing concern involved in the production of medico-surgical devices, including endotracheal cuffs. Jurisdiction in this Court is invoked pursuant to the provisions of 28 U.S.C. § 1332. A trial to the Court of the claims not subject to a stipulation[1] between the parties was

---

1. In his complaint, plaintiff sought damages, contending that Mallinckrodt had breached the terms of its employment contract with plaintiff, and declaratory relief concerning the validity of an "employment agreement" entered into by the parties.

In its amended answer, Mallinckrodt asserted counterclaims against plaintiff, and impleaded plaintiff's newly formed corporation, Sheridan Catheter Corp. ("SCC"), as a third party defendant. Seeking damages against Sheridan, Mallinckrodt alleged a breach of plaintiff's fiduciary obligations arising out of the employment relationship. In the remaining "counterclaims," Mallinckrodt sought injunctive relief against plaintiff and SCC alleging the unlawful use and disclosure by Sheridan and SCC (referred to here as "counterclaim defendants") of trade secret information belonging to Mallinckrodt, and patent infringement. Finally, SCC, in its answer to Mallinckrodt's "counterclaims" included claims for Mallinckrodt's alleged violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

The stipulation referred to above disposed of all claims in this action with the exception of

had on March 15–17 and 21, 1983.[2]

## II

According to the pretrial stipulation, David S. Sheridan is a citizen of the State of New York residing in the community of North Argyle. He has been engaged in the research, development, manufacture and sale of catheters and other medico-surgical tubing for more than 40 years, and, in these pursuits, has received more than thirty United States patents relating to medico-surgical catheters and catheter production.

In 1939, plaintiff and an associate, Norman Jeckel, formed the United States Catheter and Instrument Corporation ("USCI") in Glens Falls, New York. Following disputes between plaintiff and Jeckel over the management of USCI, plaintiff's employment with that firm was terminated. USCI still exists, however, producing heart catheters as its principal product.

After his departure from USCI, plaintiff eventually moved to North Argyle, and, in or about 1953, converted a barn located on his property into a workshop for the production of catheters. Soon thereafter, plaintiff, under the name "Sheridan Catheter and Instrument Corporation" ("SCIC") began commercially producing plastic extruded tubes and catheters.

In a factual scenario remarkably similar to the instant case, SCIC was acquired by Brunswick Corporation ("Brunswick"). In connection with the acquisition of SCIC,

Sheridan licensed his patents to Brunswick and entered an employment agreement with that firm. Following a dispute over the extent of plaintiff's authority at SCIC, Sheridan left that company. SCIC subsequently became part of a Brunswick subsidiary, Sherwood Medical Industries, Inc. ("Sherwood"). Sherwood still produces catheters and medical tubing at its facility in Argyle, New York.

Returning to his barn, Sheridan persisted in his production of medico-surgical tubing and, in 1967, formed yet another corporation, National Catheter Corporation ("NCC" or "National"). By 1973, with an eye to estate tax considerations, Sheridan began negotiating with Mallinckrodt, Incorporated ("MI" or "Mallinckrodt") for a sale to the latter of NCC. Thereafter, in July of 1974, MI and NCC's stockholders entered into an agreement and plan of reorganization, in which the parties agreed that MI would purchase all of the issued and outstanding NCC stock in exchange for 507,000 shares of MI stock. It was also agreed that Sheridan would assign to MI 16 United States patents, two United States patent applications, 25 foreign patents, and nine foreign patent applications, all relating to catheters or their production, in exchange for an additional 45,000 shares of MI stock. The transactions provided for in this agreement were closed on July 29, 1974.[3] Also on this day, Sheridan executed an "Acknowledgment" which provided:

Mallinckrodt's claim against plaintiff and SCC for their alleged use of trade secret information. At the time of trial, only four manufacturing processes or devices were alleged by Mallinckrodt to constitute trade secrets.

**2.** The following witnesses testified on behalf of Mallinckrodt: Dr. Philip E. Wiegert, Director of Research and Development at the NCC Division of Mallinckrodt; Charles J. Bates, Jr., NCC employee; Philip Stoddard, Senior Tooling Engineer in NCC's Research and Development Dep't; Lawrence Broutman, Professor of Materials Engineering at the Illinois Institute of Technology, plastics technology consultant, and Mallinckrodt's expert witness.

Counterclaim defendants called the following witnesses to testify: Dr. Philip Wiegert; plaintiff David Sheridan; Isaac S. Jackson, Execu-

tive Vice President of Sheridan Catheter Corp., and long time associate of plaintiff; Leonard B. Ryder, President of Ryder Associates, Inc., technical management plastics consultant, and expert witness for counterclaim defendants. Numerous documentary and physical exhibits were received during the trial.

**3.** In connection with the execution of this reorganization agreement, a statement of income for NCC was prepared for the year ended September 30, 1973 indicating annual net sales by NCC of $4.4 million and a net income of $1.1 million. Similar data for the six month period ended March 31, 1974 showed net sales by NCC of $2.8 million and net income of $722,-000. On the day of closing, MI stock was publicly traded at $40 per share.

I, David S. Sheridan, acknowledge that all know-how and manufacturing information which is or has been employed by National Catheter Corp. (NCC) and which has been conceived or developed by me or under my general direction or by an employee or agent or consultant of NCC is the sole and exclusive property of NCC and that NCC possesses all of the rights associated with such property including the right to prevent its unauthorized disclosure. Such property includes formulae, secret processes, manufacturing methods and procedures, patterns and equipment designs, research and technical data, and other secret manufacturing information and know-how which has been developed by me or under my general direction or by an employee or agent or consultant of NCC and which has been or is being used by NCC.

Finally, Sheridan and MI entered into an "Employment Agreement" which provided that Sheridan would continue to be employed by NCC as its chief executive officer until June 30, 1979 at an annual salary of $120,000. In 1976, NCC began to be operated by MI as a division rather than as a separate corporation.

On June 5, 1979, less than one month before the scheduled termination of Sheridan's employment with MI, Sheridan was discharged as the result of a dispute over the extent of his authority at NCC. After leaving NCC, Mr. Sheridan steadfastly continued in his production of medical tubing. Pursuant to these efforts, in July of 1981, he formed the Sheridan Catheter Corporation ("SCC") with its principal place of business in North Argyle, New York. As one of its principal products, SCC produces plastic, disposable, cuffed endotracheal tubes.[4] It is SCC's method of producing its endotracheal cuffs that MI believes to be a trade secret. It is MI's contention that the methods currently employed by SCC were developed by Sheridan during his employment at NCC. More importantly, MI contends that it purchased these alleged trade secrets, along with NCC, as evidenced by the Acknowledgment executed by Sheridan.

An extrusion blow molding process is used by NCC and SCC in producing their respective endotracheal cuffs. This process starts by "feeding" polyvinylchloride ("PVC") pellets into an extruder where they are converted into a molten stream. In the NCC process, this liquid plastic is stored in an accumulator until ready for use. (Transcript, p. 33). SCC's process has eliminated the need for an accumulator, replacing that device with a clutch and brake assembly. (Transcript, p. 59). This change in the system employed by NCC is apparently an improvement, since it decreases the distance the liquid PVC must travel before reaching the mold. The PVC is forced through a die, creating a hollow tube or parison, and then is forced under pressure into the mold. Once the parison is in the mold, the mold's openings are sealed and air is blown in, thereby inflating the molten cuffs to the mold's shape. NCC then removes the cuffs from the molds by use of mechanical "fingers." Here again, SCC has improved the procedure by utilizing air pressure to assist in removing the molded cuffs from the molds. (Transcript, p. 134). Both NCC and SCC then provide for a means of collecting the finished cuffs.

In addition to portions of the process described above,[5] Mallinckrodt contends that three devices used by NCC and SCC are misappropriated trade secrets: a chopper, a notcher and an eye punch. Essentially, a chopper is nothing more than a cutting

---

4. Endotracheal tubes, as their name suggests, are inserted into a patient's trachea in order to administer a mixture of oxygen and anesthesia. The tubes produced by SCC and NCC employ an inflatable cuff. This balloon shaped cuff surrounds the tube, and, when inflated, creates a seal against the tracheal wall preventing unwanted material, e.g., vomitus from entering the patient's lungs during the procedure.

5. Further elaboration on the process used by NCC and SCC is precluded, since this Court believes that Mallinckrodt has succeeded in establishing the secret nature of the process. Moreover, pursuant to the parties' stipulation, this Court entered a Protective Order dated July 30, 1982 preserving the confidentiality of these proceedings.

assembly, utilizing a pneumatic cylinder or electric motor to control when a blade crosses the surface to be cut. The "choppers" employed by NCC and SCC utilize multiple blades, each of which may be adjusted to change the location at which the blade meets the surface to be cut.

A notcher is another cutting instrument. It is used to produce a small hole in the secondary lumen of an endotracheal tube. The endotracheal cuffs are placed over these small holes and are inflated in the patient's windpipe by forcing air through these holes and into the cuffs. Although Mallinckrodt does not contend that the concept of notching an endotracheal tube is a trade secret, it does maintain that the particular configuration of its "in-house" notcher is superior to its competitors', and that this configuration is itself a trade secret.

Endotracheal tubes contain an elliptical opening, called an "eye," at the distal end of the tube (the end inserted into the patient). The purpose of this opening is to provide an alternate route for the anesthesia mixture to enter and exit the patient should the tube otherwise become blocked. Since the eye is located at the distal end of the tube, it is essential to have its edges as smooth as possible to minimize the possibility of injury to the patient's trachea.

Both NCC and SCC use a flat bottom punch with a half round mandrel to produce their eyes. The tube to be cut is first placed over the half-round mandrel, leaving a space between the flat portion of the mandrel and the inner surface of the tube. A flat punch then descends through the tube, pushing it towards the flat surface of the mandrel, and finally forcing its way through the tube, producing the elliptical opening, or eye. The use of an eye on endotracheal tubes is not unique to either SCC or NCC.

In support of its contentions that the processes and devices mentioned above are entitled to trade secret protection, Mallinck-

rodt has demonstrated that it employs several measures to ensure confidentiality. For example, visitors at the NCC production facility are not ordinarily permitted to enter NCC's manufacturing area; visitors may be required to execute a "Visitors Agreement" providing that non-public technical information will not be disclosed; both NCC personnel and outside contractors with access to NCC technical information are required to execute confidentiality agreements, and NCC stamps its blueprints and technical information as "confidential."

### III

According to the Restatement of Torts § 757, Comment b (1939):

A trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business and which gives him an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers .... Generally, it relates to the production of goods, as, for example, a machine or formula for the production of an article ....

The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret .... Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret.

This definition of trade secrets has been adopted by several New York State courts.[6]

---

**6.** The parties have stipulated to the applicability of New York law to Mallinckrodt's claims of trade secrets.

*See, e.g., Minnesota Mining & Manufacturing Co. v. Technical Tape Corp.,* 23 Misc.2d 671, 678–79, 192 N.Y.S.2d 102, 112–13 (Sup.Ct. Westchester Co. 1959). *See also Rapco Foam, Inc. v. Scientific Applications,* 479 F.Supp. 1027 (S.D.N.Y.1979); *KLM Royal Dutch Airlines, N.V. v. De Wit,* 98 Misc.2d 946, 415 N.Y.S.2d 190, 191 (Sup.Ct. N.Y.Co.1979).

■ Clearly, information that is generally known cannot constitute a trade secret. *Ferber v. Sterndent Corp.,* 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980). However, absolute secrecy is not required. *General Aniline & Film Corp. v. Frantz,* 50 Misc.2d 994, 272 N.Y.S.2d 600, 608 (Sup.Ct. Broome Co.1966), citing *Fairchild Engine and Airplane Corp. v. Cox,* 50 N.Y.S.2d 643 (1944). As stated by the Second Circuit, "[t]he rule is only that a 'substantial element of secrecy must exist' and this means so much that 'except by the use of improper means, there would be difficulty in acquiring the information.' Restatement, Torts § 757 (1939)." *A.H. Emery Co. v. Marcan Products Corp.,* 389 F.2d 11, 16 (2d Cir. 1968).

■ With respect to Mallinckrodt's contention that a portion of the extrusion blow molding *process* is a trade secret, this Court must agree. Mallinckrodt has taken substantial measures to protect the secret nature of this process, and it has demonstrated the competitive edge afforded by use of the process.[7] Moreover, although plaintiff and third party defendant were able to indicate to the Court similar techniques being utilized in other industries, the parties could not produce evidence of a single manufacturer which has duplicated the particular configuration in which NCC's finished endotracheal cuffs are removed from the mold. (Transcript, pp. 367–74). *Cf. Henry Hope X-ray Products, Inc. v. Marron Carrel,* 674 F.2d 1336, 1341 (9th Cir.1982). This Court finds, therefore, that Mallinckrodt has sustained its burden of proof in establishing that this process is entitled to trade secret protection.

■ Accordingly, Mallinckrodt is entitled to an injunction prohibiting SCC or Sheridan's use of the secret portion of NCC's blow molding process. Moreover, Mallinckrodt is entitled to an accounting of the profits which SCC realized as the direct result of using the secret process.[8]

■ Unlike the *process* used by NCC, this Court finds that NCC's chopper, notcher, and eye punch are not entitled to trade secret protection. This determination is mandated by Mallinckrodt's failure to demonstrate that these devices are unique to NCC's production of endotracheal cuffs.

Irrespective of the particular process employed in producing endotracheal cuffs, some means is necessary to either remove scrap material or separate finished products. NCC and SCC both use multi-blade choppers to perform this function. Apparently, Mallinckrodt's contention is that the use of an adjustable multi-blade chopper is entitled to trade secret protection. However, Mallinckrodt's expert witness testified that the concept of arranging cutting tools to accommodate various lengths of material to be cut is a conventional practice. (Tran-

---

**7.** As indicated above, in order to constitute a trade secret, the process or device must provide some competitive advantage to its owner. Here, the parties vigorously contested whether NCC's process results in the production of cuffs which are superior to those of its competitors. (Transcript, pp. 49, 188–9, 433, 472, 483). While this Court agrees with plaintiff that the process involved here is not a significant factor in producing "bi-axial," polymer orientation, there is general agreement that the process employed requires less attention from the machine operators, and makes it easier to detect defective cuffs. Although these advantages may be slight, they are responsible for helping to control production costs, and do,

therefore, provide NCC with a competitive edge.

**8.** Counterclaim defendants maintain that Mallinckrodt has "waived" its rights to an accounting by failing to specifically request that relief in the complaint. This Court disagrees. An accounting is an appropriate remedy for the misappropriation of trade secrets, *Rapco Foam, Inc. v. Scientific Applications,* 479 F.Supp. 1027 (S.D.N.Y.), citing *Franke v. Wiltschek,* 209 F.2d 493 (2d Cir.1953), and counterclaim defendants have been on notice that Mallinckrodt was seeking this equitable relief.

script, p. 115). Moreover, a *single* blade guillotine type cutter was publicly disclosed in *The Dave Sheridan Story,* a pamphlet distributed to potential consumers of endotracheal cuffs while plaintiff was employed at NCC. The cutter described there differs from NCC's chopper primarily in the number of blades used. Finally, testimony was provided by an NCC employee indicating that at least one other catheter manufacturer uses a guillotine chopper. (Transcript, p. 174). Accordingly, this Court declines to enjoin Sheridan or SCC from their use of multi-bladed guillotine choppers.

As with choppers, the concept of using a notcher to produce a hole by which a cuff may be inflated is not unique to NCC. (Transcript, p. 110). Additionally, there was testimony indicating that NCC's notcher is similar in design to the notcher used by Sherwood. (Transcript, p. 448). Therefore, this Court finds that plaintiff's use of a notcher is not entitled to trade secret protection.

The last trade secret alleged by Mallinckrodt is NCC's eye punch. Again, it is clear that the use of an eye punch is not unique to NCC or SCC, and flat punches are used to cut eyes in industries other than those in the production of medico-surgical catheters. (Transcript, pp. 99–101). Moreover, the use of a punch and mandrel is not unique to the catheter industry, and, when a flat punch is used, it is not uncommon to use a flat mandrel. *Id.* The evidence also establishes that other manufacturers have produced eyes of comparable quality to NCC's. (Transcript, p. 98). In addition, SCC has modified the eye punch used at NCC by sharpening the cutting edge and using a teflon, rather than a steel, mandrel. Like the chopper referred to above, Sheridan's use of a dull punch was publicly revealed in *The Dave Sheridan Story* during his employment with NCC.[9] In light of these circumstances, this Court is unable to conclude that NCC's eye punch is a trade secret as that term is defined by the courts of New York State.

## IV

Accordingly, for the reasons mentioned above, Mallinckrodt is entitled to an injunction prohibiting Sheridan and Sheridan Catheter Corporation from using that portion of NCC's blow molding process which this Court finds to be a trade secret.[10] Additionally, Mallinckrodt is entitled to an accounting by counterclaim defendants of all profits directly attributable to their misappropriation of Mallinckrodt's trade secret. Counsel shall meet for the purpose of preparing an appropriate order implementing the terms of this decision. The foregoing constitutes this Court's findings of fact and conclusions of law in accordance with Fed. R.Civ.P. 52(a). Entry of judgment in favor of defendant-third party plaintiff, Mallinckrodt, Inc., is directed.

It is so Ordered.

**9.** Sheridan relates how he happened upon the advantages of using a dull punch:

> One day I'm fooling around in the barn, . . . and I noticed that one section of one eye had kind of a nice, rounded edge. I looked at the punch I was using and, when I lined it up with the smooth section, I saw that part of the die was dull. I immediately knew I had a method of making smooth eyes. I made the whole cutting edge of the punch dull, and I put it in the machine and I got the most beautiful smooth eye you ever saw.

*The Dave Sheridan Story,* by W.C. Hines (Copyright 1977 by Albany Medical Center Foundation).

**10.** This Court is aware of New York's "general public policy favoring robust and uninhibited competition," and "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *American Institute of Chemical Engineers v. Reber-Friel Co.,* 682 F.2d 382 (2d Cir.1982), citing *American Broadcasting Companies, Inc. v. Wolf,* 52 N.Y.2d 394, 404, 438 N.Y.S.2d 482, 487, 420 N.E.2d 363, 368 (1981). These considerations are inapplicable here, since plaintiff, a sophisticated businessman, sold his entire business to Mallinckrodt in return for valuable consideration, and agreed not to disclose secret information subject to that sale. *See Id.,* (Mansfield, J., dissenting opinion).