**JULIE RESEARCH LABORATORIES, INC., Plaintiff,**

v.

**SELECT PHOTOGRAPHIC ENGINEERING, INC., Philip Boettger, Sandra Boettger, Neil Darrish, Jim Linford and PLI Photo Lab, Inc.,**

**No. 92 Civ. 0613 (RLC).**

United States District Court, S.D. New York.

Nov. 24, 1992.

Feldman & Troup, P.C. (Steven Troup, Matthew Litsky, of counsel), New York City, for plaintiff.

Parker Chapin Flattau & Klimpl (Stephen F. Harmon, of counsel), New York City, for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff, Julie Research Laboratories, Inc. ("JRL") is a New York corporation, with its principal place of business in New York. Its president, Loeb Julie, is responsible for the creation of the JRL Diamond, the product involved in this litigation. Defendant, Select Photographic Engineering, Inc. ("Select") is an Arizona proprietorship. Defendants, Philip and Sandra Boettger, are the proprietors of Select and are citizens of Arizona. Defendant, Neil Darish,[1] is the marketing director of Select and is a citizen of Arizona. Defendant, Jim Linford, is an independent contractor hired by Select to assist in the sale and promotion of the JRL Diamond and is a citizen of California. Defendant, PLI Photo Lab, Inc. ("PLI"), is an Ohio corporation with its principal place of business in Ohio.

Plaintiff in or about 1987, put together an electronic photographic retouching and imaging system which it called the JRL Diamond. Plaintiff, seeking someone to market the Diamond, demonstrated the system on its premises in New York in

---

1. Darish's name is misspelled in the caption filed in the case.

September, 1990, to Jack Torgenson, a former Select employee. Torgenson suggested Select. In October, 1990, Philip Boettger and Bruce Rubadeux, a consultant visited JRL facilities in New York and were given a demonstration of the Diamond. There was no claim to Torgenson, Boettger or Rubadeux at these demonstrations to Boettger or Rubadeux that the Diamond contained anything that was proprietary, confidential or a trade secret. Indeed, plaintiff refused Boettger's and Rubadeux's offer to sign a confidentiality agreement.

Rubadeux evaluated the JRL Diamond for Select in a report completed within a few days of the demonstration. In his report Rubadeux identified the Diamond as PC-based, running on a DOS operated system which included QFX, TIPS, and RIO and using a Wacon tablet.

Subsequent to their meeting in New York plaintiff and Select reached agreement orally (plaintiff rejected a written accord) pursuant to which Select was to market the Diamond, provide space in its booths at various trade shows for showing the Diamond, with plaintiff's staff appearing at the trade shows to demonstrate the Diamond and to answer technical questions. Select was to receive a 15 percent commission on sales of the Diamond and a 40 percent commission on the sale of peripherals.

Neil Darish spent time at plaintiff's facilities in New York in the fall of 1990 familiarizing himself with the Diamond and in drafting sales literature. He did not enter into a confidentiality agreement with plaintiff concerning any proprietary information he might acquire in the process. The Diamond was featured in Select's booths at trade shows in 1991 in Las Vegas in February, Chicago in September and New York in November, along with a prominently displayed informative and complimentary article about the Diamond by Elizabeth Cunningham.

In 1991, Select sold a Diamond workstation to Andre's, a photo lab in Chicago where defendant Jim Linford was employed at the time. While at Andre's Linford had written a report evaluating various electronic photographic retouching and imaging systems including the JRL Diamond. When Linford left Andre's in the summer of 1991, he approached plaintiff to have the latter engage him to do a brochure on the Diamond. Plaintiff referred him to Select, and Select took him on to do the brochure. Linford spent the summer and fall of 1991 in New York at plaintiff's premises preparing the brochure on the Diamond. He did not enter into a confidentiality agreement with plaintiff concerning any trade secret information he might discover about the Diamond in the preparation of this brochure.

Almost from the outset the relationship between plaintiff and Select was marked by disagreement over marketing strategies for selling the JRL Diamond, involving promotional literature, sales approaches to potential buyers and Julie's continual interference with Select's particular marketing efforts to close a deal with putative customers manifesting interest in the Diamond.

Early in December, 1991, Select learned from Elizabeth Cunningham that plaintiff was seeking to find a sales representative for the Diamond to replace Select. While Julie denies he was seeking a replacement for Select, he admits confiding in Cunningham that he was much dissatisfied with Select's efforts in promoting and selling the Diamond. At any rate, this led to termination of the agreement by Select. Select gives December 26, 1991, as the termination date. Plaintiff places the date a few days later in December. Whether the relationship ended on December 26, 1991, or a few days later is irrelevant to our concerns.

On December 20, 1991, in apparent anticipation of the dissolution of the agency relationship with plaintiff, Select met with Eric Sandel, an integrator, to discuss the possibility of his constructing a fast operating electronic photographic retouching and imaging system, using Hi-res QFX to handle large files. Sandel developed the Edge, which is subject to the preliminary injunction currently outstanding in this case.

In August, 1991, defendant PLI ordered a Diamond workstation and peripherals through Select. The total amount of the purchase was $332,195.00, of which plaintiff claims $108,900.00 is still owing. PLI was not satisfied with the Diamond's performance, claiming that it was slower than advertised. It seeks a return of the work station and/or credits of $19,595.00 for return of the tape drive and exabyte, $37,000 for Fire 1000, filesilver and $13,000 for software never received against its payment of $218,000.

Plaintiff obtained a preliminary injunction barring defendants from distributing or marketing an electronic photographic retouching and imaging system called the Edge, having convinced the court that it was a copy of the Diamond which defendants had constructed by misappropriation of plaintiff's proprietary trade secrets involved in the development of the JRL Diamond. Plaintiff seeks a permanent injunction barring the Select defendants for a term of years from marketing, selling or promoting any PC-based electronic photographic retouching and imaging system, and from using or disclosing the configuration of the Diamond workstation and from using or disclosing the unique training, techniques or procedures in the operation of the Diamond. Plaintiff also seeks judgment against Select of $50,000.00 for training of Linford in the operation of the Diamond and judgment against PLI for unpaid balance due of $108,900 on its purchase of the Diamond.

As they have maintained at the preliminary injunction hearing, defendants in the trial on the merits argue that no trade secrets or proprietary information was misappropriated by them from plaintiff because there were none; that Select owed no fiduciary duty to plaintiff; that their relationship was at will and plaintiff never sought nor secured from them a confidentiality agreement as to any proprietary information concerning the Diamond. Defendants seek vacation of the preliminary injunction and dismissal of the complaint.

PLI seeks to repossess its benchmark from plaintiff and to return the Diamond. In the alternative, it seeks credits against the purchase price of various components not received or purchased elsewhere.

DETERMINATION

■ A trade secret can be anything used in one's business which gives an advantage over competitors who do not know or use it. *Rapco Foam Inc. v. Scientific Applications Inc.*, 479 F.Supp. 1027, 1029 (S.D.N.Y.1979) (Sofaer, J.). A plaintiff must prove it possessed a trade secret and that a defendant used that secret in breach of an agreement, confidence or duty or as result of illicit discovery. *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 375 (S.D.N.Y.1989) (Ward, J.), *aff'd*, 920 F.2d 171 (2d Cir.1990); *Chicago Lock Co. v. Fanberg*, 676 F.2d 400 (9th Cir.1982); *Computer Assoc. International, Inc. v. Bryan*, 784 F.Supp. 982, 987–88 (E.D.N.Y.1992); *Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 80, 248 N.E.2d 910, 911–12 (1969). Disclosure through fair discovery is not actionable.

The definition of a trade secret has been adopted as the law of New York from the Restatement of Torts § 757, comment b which provides:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*Integrated Cash Mgmt. Services, Inc v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990).

At the hearing on the preliminary injunction plaintiff put on as its first witness Eric Sandel, the integrator responsible for developing the Edge, and elicited from him what he had done and the ingredients he had used in constructing the Edge. The next day Loeb Julie took the stand and presented an exhibit called the "THE CHOICE MATRIX" which is set out below.

CONFIDENTIAL

## THE CHOICE MATRIX

### FOR DESIGNING A RETOUCHING/IMAGING SYSTEM FROM SCRATCH

| | |
|---|---|
| 1. CHOOSE 1 OUT OF 9 <u>CPU TYPES</u> | HP XXX, DEC VAX, SUN, SILICON GRAPHICS, DATA GENERAL, IBM PC, APPLE MAC, NEXT, AMIGA |
| 2. CHOOSE 1 OUT OF 3 <u>PROCESSOR TYPES</u> | 80286, 80386, 80486 |
| 3. CHOOSE 1 OUT OF 3 <u>COMPUTER BUS TYPES</u> | MCA, EISA, ISA |
| 4. CHOOSE 1 OUT OF 8 <u>OPERATING SYSTEMS</u> | UNIX, WINDOWS, OS/2, DOS 3, 4 OR 5; DR DOS 5 OR 6 |
| 5. CHOOSE 1 OUT OF 2(3) <u>IMAGE MEMORY TYPES</u> | NORMAL HARD DISK, LARGE RAM, (XXX) |
| 6. CHOOSE 1 OUT OF 5 <u>DISK DRIVE TYPES</u> | ESDI, MFM, SCSI, RLL, IDE |
| 7. CHOOSE 1 OUT OF 11 <u>IMAGE DISPLAY BOARDS</u> | MATROX, DATA TECHNOLOGY, TARGA 16, TARGA 24, TARGA 32, TARGA PLUS, VISTA, DATA TRANSLATION, OPTA, EVEREX, NEW MEDIA |
| 8. CHOOSE 1 OUT OF 12 <u>IMAGING/RETOUCHING SOFTWARE PROGRAMS</u> | LUMENA, NPS, IMAGE–IN, PHOTOSTYLER, TIPS, WINRIX, QFX, PAINTBRUSH, RIO, TEMPRA, SABLE, GIANT PAINT |
| 9. CHOOSE 1 OUT OF 5 <u>POINTING DEVICE TYPES</u> | MOUSE, TRACKBALL, TOUCHSCREEN, TABLET, LIGHT PEN |
| 10. CHOOSE 1 OUT OF 7 <u>TABLETS</u> | HOUSTON, SUMMAGRAPHIC, HITACHI, SEIKO, WACOM, CALCOMP, KURTA |
| 11. CHOOSE 1 OUT OF 6 <u>LINE STORAGE DEVICES</u> | DAT, ¼ INCH TAPE, 9–TRACK, WORM, <u>OFF–EXABYTE</u>, ERASEABLE OPTICAL |
| 12. CHOOSE 1 OUT OF 4 <u>STORAGE DEVICE SOFTWARE PROGRAMS</u> | CDS, ASPI, NOVASTOR, SYTOS |

---

The first page sets forth the 12 elements of plaintiff's design of the Diamond. He used the exhibit to demonstrate that Sandel's Edge was a duplicate of the plaintiff's design of the Diamond in each of the 12 components listed.

 Misappropriation of a trade secret and use are actionable, and access suffices to establish prima facie misappropriation and use. *Merritt Forbes & Co. v. Newman Invest. Secur., Inc.,* 604 F.Supp. 943, 956–57 (S.D.N.Y.1985) (Sweet, J.); *Decorative Aides Corp., Inc. v. Staple Sewing Aides Corp.,* 497 F.Supp. 154 (S.D.N.Y. 1980) (Carter, J.), *aff'd without op.,* 657 F.2d 262 (2d Cir.1981). To succeed on wrongful appropriation of a trade secret, the trade secret's existence must be shown and copying by the defendant. Copying can be established by showing access and substantial similarity.

At the hearing on the preliminary injunction a case of unauthorized use seemed reasonably clear. Select, along with Darish and Linford, certainly appeared to have had access to the Diamond, and the Edge and the Diamond seemed constructed similarly. Plaintiff at the preliminary hearing

testified at length about the effort and time it took in developing the Diamond, the long process of trial and error of the various off-the-shelf products until the right components, proper configuration and alignment were found.

That the various properties of a trade secret may be in the public domain does not diminish its protectability if the components are combined into a unified process or operation which in unique combination affords a competitive advantage, *Imperial Chemical Industries Ltd. v. National Distillers & Chemical Corp.*, 342 F.2d 737, 742 (2d Cir.1965); *Q–Co. Industries, Inc. v. Hoffman*, 625 F.Supp. 608, 617 (S.D.N.Y.1985) (Sweet, J.), or if the computer hardware and software involved are linked together or arranged in a unique way to produce a singular product not generally accomplished with the use of these off-the-shelf articles. *See Integrated Cash Management, supra,* 920 F.2d at 174; *Roy Export Company Establishment v. Columbia Broadcasting System, Inc.,* 672 F.2d 1095, 1105 (2d Cir.1982) *cert. den.,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *McKay v. Communispond, Inc.,* 581 F.Supp. 801, 807 (S.D.N.Y.1983) (Cannella, J.)

A clear case of unauthorized use seemed conclusive at the hearing on the preliminary injunction by what appeared to be a fiduciary relationship between plaintiff and the Select defendants. At the time the court did not focus on the fact that plaintiff defined its trade secret in wholly conclusory terms, i.e., that the Diamond was a very fast PC electronic photographic retouching and imaging system that could do anything the larger systems could do at modest costs. The lack of specificity and concreteness in plaintiff's definition of the trade secrets it sought to protect appeared to result more from the court's failure to grasp or understand the workings of an electronic photographic retouching and imaging system than from any insufficiency in plaintiff's concretizing the proprietary information claimed to have been subject to unauthorized appropriation.

At the hearing on the merits, however, the court sought *ad nauseam* to have the plaintiff explain what was proprietary about the Diamond. That question was never answered. Plaintiff has yet to set forth on the record what alterations or configurations of the off-the-shelf components of the Diamond constitute proprietary or trade secret information.

The owner of the proprietary information need not show that the matter is vital to his business, as long as he establishes that the information would provide the unauthorized user with an unfair competitive advantage which it would not otherwise have. *Greenwich Mills Co., Inc. v. Barrie House Coffee Co., Inc.,* 91 A.D.2d 398, 405, 459 N.Y.S.2d 454, 459 (2d Dep't 1983). The burden, however, is on the plaintiff to define or identify in detail the trade secret or proprietary information it alleges has been misappropriated by defendants. *Xerox Corp. v. International Business Machines Corp.,* 64 F.R.D. 367, 371–72 (S.D.N.Y.1974) (Edelstein, J.); *Struthers Scientific and International Corp. v. General Foods Corp.,* 51 F.R.D. 149, 153 (D.Del.1970) ("plaintiff should * * * specifically describe what particular combination of components it has in mind, how those components are combined, and how they operate in a unique combination.")

The threshold inquiry and the most important initial consideration is whether there is in fact a trade secret. "Secrecy is a question of fact". *Lehman v. Dow Jones & Co.,* 783 F.2d 285, 298 (2d Cir.1986). In this jurisdiction courts are required to examine the following factors to determine whether a trade secret in fact exists:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the competition to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*See e.g., Integrated Cash Mgmt. Services, Inc.,* 920 F.2d at 173; *Computer Associ-*

*ates International, Inc.,* 784 F.Supp. at 987; *Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 803–04, 453 N.Y.S.2d 470, 472 (4th Dep't 1982) (quoting Restatement of Torts § 757, comment b). *See also, Pressure Science, Inc. v. Kramer,* 413 F.Supp. 618 (D.Conn.), *aff'd without op.,* 551 F.2d 301 (Table) (2d Cir.1976).

■■■ The court concludes that Julie has not defined his trade secret because there is none. All he appears to have done is to take Hi-res QfX and follow the manufacture's suggestions as to how to obtain the best result with its usage which called for using categories 1, 2, 4, 7, 9 and 10 of the Choice Matrix. EISA is an obvious choice because it is the fastest operating computer bus type (category 3) on the market. The value and uses of Category 6, SCSI fast drives and Category 5, Large RAM and controller cards are specified in the literature. Exabyte (category 11) is standard in the industry, and the use of 4mm Dat was revealed in the literature about the Diamond distributed at various trade shows. Category 11 and category 12 are not integral components of an electronic retouching and imaging system in any event. He has not altered or individualized any of the 12 components which are listed on his Choice Matrix. Plaintiff has failed to surmount his threshold burden of establishing that there is in fact a trade secret, or in defining what the trade secret is for which protection is sought.

■■■ Even assuming that plaintiff does possess a trade secret and has defined it with sufficient specificity, plaintiff still cannot prevail because of the deficiency of its efforts to maintain secrecy. This is a fatal defect. *Sheridan v. Mallinckrodt, Inc.,* 568 F.Supp. 1347, 1352 (N.D.N.Y. 1983). While absolute secrecy is not necessary, *A.H. Emery Co. v. Marcan Products Corp.,* 389 F.2d 11, 16 (2d Cir.1968), *cert. den.,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968), a showing of substantial measures to protect the secret nature of the process is required, *Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1063 (2d Cir.1985), *cert. den.,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *Q–Co. Industries, Inc.,*

625 F.Supp. at 616–17. Proof that a substantial element of secrecy existed so that except by use of improper measures, there would be difficulty in acquiring the information is sufficient. *Defiance Button Machine Co.,* 759 F.2d at 1063. With even a mere inadvertent or accidental disclosure, the matter ceases to be a trade secret and will no longer be protected. The adequacy of the measures taken to protect the secrecy of the product is a fact question.

The testimony is uncontradicted that in its dealings with Torgenson, Boettger, Rubadeux, Darish, Linford and the proprietors of PLI, no effort was made to bind these people to a confidentiality pledge in respect of the Diamond. Although the Diamond was demonstrated to each of them, they were not asked to agree not to reveal any proprietary information gleaned or to sign a statement to that effect. Indeed, the offer to enter into such agreement was dismissed as unnecessary. It was not until this litigation commenced that any of the defendants were asked to make such agreement.

Brochures distributed at trade shows in 1991 identified these salient features of the Diamond: a 486 PC base; DOS; 16 megabytes of RAM; 1.2 gigabytes of disk; a high-resolution monitor; a digitizing cordless, pressure-sensitive tablet; the availability of Exabyte 9 track and 4mm DAT as storage. This information identifies 6 of the categories set forth if the Choice Matrix which plaintiff claims are Diamond trade secrets: PC, DOS, a large RAM, Wacon Tablet, 9 track and 4mm DAT.

■■■ This does not end the inquiry, however. If defendants Select, Boettger, Darish or Linford were in a fiduciary relationship with plaintiff and made unauthorized use of Diamond's trade secrets, plaintiff may nonetheless be entitled to protection even though what was used was not a trade secret. *Heyman v. AR. Winarick, Inc.,* 325 F.2d 584, 586–87 (2d Cir.1963). One who acquires special knowledge or information via a confidential or fiduciary relationship with another may not exploit the information to his own advantage but must account to the victim for his profits. An agreement of confidentiality is not es-

sential. The circumstances may suffice to show a relationship of trust and confidence based on the dealings of the parties. When a seller reveals part of the secret to enable a buyer to evaluate property, the buyer is required to use information in ambit of the limitations and may not use information in a venture of his own. *See Ferranti Electric, Inc. v. Harwood,* 43 Misc.2d 533, 251 N.Y.S.2d 612 (S.Ct.1964). The short of it in this case, however, is that there was nothing of confidence to exploit because there were no trade secrets, and, plaintiff, until it commenced this litigation, operated as if it had no secrets to protect.

■■■ There was no confidentiality agreement between Select and plaintiff as to the Diamond's trade secrets. The contractual relationship between them was subject to termination at the will of either party at any time. *Murphy v. American Home Prod. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Select was an independent contractor in its relationship with plaintiff as its sales representative, and while it could terminate the relationship at will, during the existence of the relationship it had an obligation of loyalty to plaintiff. *E.W. Bruno Co. v. Friedberg,* 21 A.D.2d 336, 250 N.Y.S.2d 187 (1st Dep't. 1964).

When Select learned that Julie was looking for a new agent and decided to explore the possibility of manufacturing and promoting a PC-based electronic photographic retouching and imaging system on its own, Select did not infringe upon that obligation by consulting with Sandel and having him construct the Edge as a possible competitor to the Diamond prior to the termination of the relationship with plaintiff, since it made no improper use of plaintiff's proprietary secrets in the process. *Walter Karl, Inc. v. Wood,* 137 A.D.2d 22, 528 N.Y.S.2d 94 (2d Dep't.1988); *Schneider Leasing Plus, Inc. v. Stallone,* 172 A.D.2d 739, 569 N.Y.S.2d 126 (2d Dep't.1991); *Schwartz v. Leonard,* 138 A.D.2d 692, 526 N.Y.S.2d 506 (1st Dep't.1988).

Under New York law defendants were free to proceed to secure the services of Sandel in an effort to create a rival system of their own. While Julie disputes telling Cunningham that he was going to termi-

nate the relationship with Select, he admits telling her of his dissatisfaction. Under the circumstances Select was justified in looking elsewhere in the attempt to protect its interest.

There is no evidence to support the claim that Select did not pursue qualified sales leads diligently. The evidence is to the contrary. Select sought to promote the Diamond and to sell the product. The difficulty between the parties was disagreement on how best to accomplish this.

As to the dispute with PLI, the latter has no right now to return the Diamond. Therefore, with credits for the materials it did not receive and/or returned promptly, there is a balance of $44,600.00 still owing by PLI. The charge for the Diamond system was $332,195. Of this amount PLI paid $218,000. It is entitled to credits of $19,595 ($13,600 for return of the tape drive and $5,495 for return of exabyte); credits of $37,000 for Fire 1000 ($27,000 payment made directly to Cymbolic missing chip purchased separately at $10,000); and fireserver credit of $13,000 for software not received. Thus PLI is entitled to a total of $287,595 in credits towards the $332,195 cost of the Diamond. Of the amount still owing, Select is entitled to its 15 percent commission of $6,690, leaving $37,910 owed by PLI to plaintiff with interest at 9 percent from the date of filing of this litigation.

As to PLI's counterclaim, the benchmark which PLI created to test the capability of the Diamond and other equipment and sent on floppy disk to plaintiff belongs to PLI and should be returned to it.

Finally, the claim of plaintiff for $50,000 for training Linford has no merit. Select was not advised that it was undergoing such a financial obligation when Linford went to New York. The purpose of Linford's being sent to New York was to do a promotional brochure on the Diamond to enhance the salability of the product. Linford was performing a task designed to benefit plaintiff and Select and it was in plaintiff's interest that it inform Linford about the Diamond so that he could do a persuasive piece about it.

522

Accordingly, all claims against the Select defendants (Select, the Boettgers, Darish and Linford) are dismissed. Plaintiff is to have judgment against PLI in the sum of $37,910 with interest at 9 percent from the date of institution of this lawsuit. Plaintiff is ordered to return to PLI the benchmark PLI created. All other claims are dismissed.

IT IS SO ORDERED.