**The A. H. EMERY COMPANY,**
**Plaintiff-Appellee,**

v.

**MARCAN PRODUCTS CORPORATION, Marshall Control Products Corp., Hugh A. Mills, Ronald R. Marshall, and David E. Golding, Defendants-Appellants.**

**No. 157, Docket 31684.**

United States Court of Appeals
Second Circuit.

Argued Oct. 27, 1967.

Decided Jan. 18, 1968.

Ronald J. St. Onge, Stamford, Conn.
(John C. Blair, Robert A. Cahill, Charles

I. Sherman, and Blair, Buckles, Cesari & St. Onge, Stamford, Conn., on the brief), for plaintiff-appellee.

John M. Calimafde, New York City (Roy C. Hopgood, Paul H. Blaustein, and Hopgood & Calimafde, New York City, on the brief), for defendants-appellants.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

The complaint in this action charged the defendants with patent infringement and unfair competition. Federal jurisdiction was based on 28 U.S.C. § 1338(a) and (b). During pre-trial discovery it became apparent that the patent asserted in the suit was invalid but the defendants wanted the patent issue to remain in the case in order that judgment might be rendered on their counterclaim for invalidity. At the trial the plaintiff offered no evidence of infringement and at the end of its case the patent infringement claim was dismissed. The trial, which lasted some seven days, was thus directed almost exclusively to the plaintiff's claim of unfair competition, a charge which arose out of the alleged misappropriation and use by the defendants of certain trade secrets of the plaintiff. The trial court in deciding for the plaintiff found no merit in the defense that the misappropriated secrets had not in fact been used by the defendants. After the opinion of the court was filed, the case was reopened on the defendants' motion for reconsideration in order that testimony might be heard in support of their claim that the plaintiff had been guilty of "unclean hands" in alleging patent infringement when it knew or should have known that the patent was invalid, and that this misconduct was a bar to the relief granted on the trade secrets issue. After hearing testimony in connection with this claim, the court again ruled against the defendants, and judgment was entered in favor of the plaintiff. From this judgment the defendants have appealed. We affirm.

The appellants claim that certain of the trial court's findings in regard to the trade secrets charge were "clearly erroneous" and that the court abused its discretion in not sustaining the defense of "unclean hands." Judge McLean's opinions set out carefully and in detail the facts on which his conclusions were based. In the light of the evidence and the inferences reasonably to be drawn therefrom we are satisfied that there was no clear error.

For many years the plaintiff-appellee, the A. H. Emery Company (Emery), has been engaged in the manufacture and sale of a variety of precision weighing devices at its plant in New Canaan, Connecticut. The hydraulic load cell, the device involved in the present litigation, was designed to weigh a large load without sacrificing the accuracy achieved in substantially smaller weighing devices. In simplest terms it consists of a cylindrical chamber, containing hydraulic fluid, a load head or platform upon which the thing to be weighed is positioned, and a piston which transmits the weight of the object from the load head to the fluid in the chamber where a measuring instrument records the increase in pressure thereby created. The high degree of accuracy achieved in the plaintiff's cell is in part attributable to the presence of a steel ball between the load head and the piston, which operates to reduce the adverse effects of torque and other disturbing forces which are produced when the object to be weighed is not exactly centered on the load head. The ball may be either "low" or "high" in the load cell; in the former construction it is contained in a recess in the piston below the load head, whereas in the latter it is housed in a recess in the load head itself and rolls on the uppermost surface of the piston, rather than on the bottom of the recess in the interior of the piston. The plaintiff makes load cells of both the "high" and the "low" ball variety.

From 1943 until his departure from Emery in 1960, the defendant, Hugh A. Mills, was employed by the plaintiff, first as a research and development engineer and later as a sales representative. While he was so employed Mills assem-

bled at his home a complete low ball load cell, Model EC 30. For the most part this was accomplished by using discarded parts which he obtained at the plaintiff's plant. In March of 1960 Mills was dismissed from the plaintiff's employ. Shortly thereafter, along with defendants David E. Golding and Ronald R. Marshall and two others, he helped to found the corporate defendants, Marcan Products Corporation and Marshall Control Products Corp. (Marcan and Marshall Control), to engage in the manufacture and sale of hydraulic load cells. Originally it was planned that Golding would copy the low ball cell which Mills had assembled and that the defendant companies would produce and sell the resultant "Marcan M-25" cell in competition with the plaintiff's EC 30. Initial progress made in this direction was interrupted in November, 1960, however, when a patent on a low ball cell was issued to Malcolm C. Tate, its inventor, then an officer and principal stockholder of the plaintiff, and assigned to Emery. Thereafter Mills and Golding consulted a patent attorney and were advised that the low ball cell which they contemplated making would infringe the Tate patent, but that a high ball cell would not. Accordingly they decided to make the high ball type and the first Marcan M-25 high ball cells were manufactured and delivered to their customers by January 31, 1961. Other than the location of the ball, these cells were essentially the same as the plaintiff's EC 30.

Robert Northrop was a draftsman employed by Emery from 1949 until September of 1960 when he left the plaintiff's employ. For the most part, his work had consisted of making drawings of parts of Emery cells, particularly of the EC 30 cell, the plaintiff's principal product, and he was therefore thoroughly familiar with the dimension and tolerance data used in their construction. In December of 1960 Northrop produced, at

Mills' request, a complete set of parts drawings of the Emery EC 30 cell, showing dimensions and tolerances, which he sold to Mills for $150. An accurate load cell could not have been produced by the defendants without the tolerance information contained in the Northrop parts drawings and, although some of the more obvious features of the cell might have been measured and copied from the model Mills had assembled, it was these drawings which enabled the defendants to manufacture a cell to compete with those made by the plaintiff.

As stated above it had become apparent at pre-trial that the patent, which the plaintiff asserted, had become invalid because over a year before the patent application had been filed, the plaintiff had made to two customers several sales of its low ball cell device. See 35 U.S.C. § 102(b). The plaintiff, therefore, presented no evidence of infringement at the trial and the trial court entered judgment for the defendants on their counterclaim.

Although at the trial the plaintiff claimed that a variety of trade secrets had been misappropriated and used by the defendants, the court held only that the information contained in its parts drawings, which had been reproduced from memory by Northrop for the use of the defendants, constituted protectable trade secrets. It said, " * * * the detailed data contained in the parts drawings was intended by plaintiff to be confidential, for use by plaintiff's employees in the course of their employment, and that the employees, specifically Mills and Northrop, so understood." The court correctly ruled that, through the sale of its product in the public market, the plaintiff had released any claim to trade secrets in readily discernible physical features of the cell or in its measurable dimensions.[1] The tolerance data, on the other hand, could not be obtained through observation or analysis of the cell itself, and sales of the product did

---

1. See Specimer v. Reynolds Metals Co., 177 F.Supp. 291, 296 (S.D.N.Y.1959); Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 213 A.2d 769, 778–779 (1965); Schavoir v. American Re-Bonded Leather Co., 104 Conn. 472, 476, 133 A. 582, 583 (1926).

not constitute a release of plaintiff's claim to secrecy in that regard. Accordingly it enjoined any further use or disclosure of such information by the defendants, as well as the sale of products produced with the aid of such data.

■ Appellants contend that the plaintiff failed to prove there was a trade secret and, if there ever was one, the appellants showed conclusively that it was released when the plaintiff circulated parts drawings to certain of its customers and to various members of the trade. They point to the testimony of the defendant Mills to the effect that these drawings were freely shown to prospective customers and to others on demand. This testimony, however, was contradicted by that of Tate who could recall only "a few rare instances" where parts drawings might have been shown or sent to customers but in those instances the parts drawings revealed only the external portions and "whatever we sent out did not show the internal construction of the cell, the internal workings of the cell." The trial judge was clearly justified in believing Tate, who, he found, was "an honest man" rather than Mills whose testimony he discredited. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 336 U.S. 271, 275, 69 S.Ct. 535, 93 L.Ed. 672 (1949). Even though parts drawings may on occasion have been shown to a limited number of outsiders for a particular purpose, this did not in itself necessarily destroy the secrecy which protected them before they were so disclosed. In any context "secrecy" is a relative term and, as used in the law of trade secrets, it is not an absolute but an equitable concept. L. M. Rabinowitz & Co. v. Dasher, Sup., 82 N.Y.S.2d 431, 437 (1948). The rule is only that a "substantial element of secrecy must

exist" and this means so much that "except by the use of improper means, there would be difficulty in acquiring the information." Restatement, Torts § 757 (1939). The trial court's findings in this case were fully consistent with this standard and the conclusion it reached is not only supported by the evidence but by the very fact that Mills resorted to subterfuge in order to obtain the coveted information, which would have been unnecessary if, as appellants now claim, the tolerance data had been freely disclosed to all comers.

■ The only other argument which the appellants have pressed in regard to trade secrets is that the plaintiff failed to prove that either Northrop or Mills had any reason to believe that the data contained in the plaintiff's parts drawings was intended to be confidential or that a divulgence of this information would be considered a breach of confidence.[2] They rely heavily on the fact that neither of these employees had ever been expressly informed, while in the plaintiff's employ, of the confidential nature of the parts drawings, or otherwise alerted to that fact, e. g., by labels or stamps giving notice that it was secret matter. But it is well settled that detailed manufacturing drawings and tolerance data are prima facie trade secrets. See e. g., Schulenberg v. Signatrol, Inc., 33 Ill.2d 379, 212 N.E.2d 865, 869 (1965). Educated employees, such as these, fully conversant with the importance of the data in the plaintiff's manufacturing process, should be aware that the information is not meant to be revealed to outsiders or used to the disadvantage of its owner. Mills might have deduced as much from the fact that, unlike assembly drawings which were freely circulated to customers, the parts drawings were not.

2. The standards which the plaintiff's proof must meet in an action for misappropriation of trade secrets are set out in the rule in § 757 of the Restatement, Torts (1939):

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if * * *

(b) his disclosure or use constitutes a

breach of confidence reposed in him by the other in disclosing the secret to him, or

(c) he learned the secret from a third person with notice of the facts that it was a secret and * * * that the third person's disclosure of it was otherwise a breach of his duty to the other, * * * *."

That Mills was willing to pay for the information attests to his belief in its value. Under these circumstances we cannot say that the trial court's finding that both Mills and Northrop understood the data to be confidential was "clearly erroneous."

Appellants urge as an independent ground for reversal "bad faith and unclean hands" for the way in which the plaintiff handled its patent infringement claim. They assert that the plaintiff engaged in misconduct sufficiently pervasive to disentitle it to the relief granted in connection with the trade secret claim. On this point the trial court found that the conduct of the plaintiff was at times "inept" or "negligent" but never fraudulent or malicious, and concluded that the defendants "should not be permitted to get off scot-free merely because plaintiff's conduct in some respects may leave something to be desired." On this aspect of the case we decide that, while the record would have supported the trial judge if he had reached a contrary conclusion, *it does not show that he abused his equitable discretion in reaching the one which he did.*

▉▉▉▉ The first instance of alleged misconduct relates to the application for a patent on the plaintiff's low ball cell which was filed by Tate with the Patent Office on July 5, 1957. Tate signed the usual inventor's oath containing the following statement: "I do not know and do not believe that this invention was ever * * * in public use or on sale in the United States for more than one year prior to this application." This statement was untrue, since, more than one year prior to the Tate application, the plaintiff had sold at least ten of the subject cells, five to the Hooker Electrochemical Company and five to Pratt & Whitney Aircraft, and, as the court noted, there was convincing evidence that Tate was aware of these sales at the time he signed the oath. The court found that Tate's conduct had been negligent, but not intentionally fraudulent. This conclusion was based upon the finding that Tate did not read the oath which he signed and that he was therefore not aware of its contents.[3] The appellants have argued rather persuasively that to excuse Tate's cavalier behavior would disregard the public's "paramount interest in seeing that patent monopolies spring from backgrounds free from fraud *or other inequitable conduct,*" Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (emphasis supplied), and urge that knowledge of the oath's contents be imputed to Tate for the purpose of application of the unclean hands doctrine. Cf. Ives v. Sargent, 7 S.Ct. 436, 30 L.Ed. 544, 119 U.S. 652 (1887); Anderson v. Tway, 143 F.2d 95 (6 Cir. 1944), cert. denied 324 U.S. 861, 65 S.Ct. 865, 89 L.Ed. 1418 (1945). The argument has considerable force and, had the trial court been faced with the necessity of passing upon the effect of such negligence on the plaintiff's claim of patent infringement, it would have furnished a proper basis for the court to deny relief to the plaintiff on that charge, even though it concluded that Tate had not practised wilful and intentional deceit as in Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933), or perpetrated a wilful and intentional fraud on the Patent Office, as was the case in *Precision.*[4]

---

3. The court made the following finding: "I find that when Tate signed his oaths he was unaware of the fact that the oath contained a representation denying the existence of the sales. He signed the oaths in a purely perfunctory manner, without reading them carefully. His attention was not called to what he was signing. No investigation was made by him or by counsel to ascertain whether or not sales had in fact taken place. His representations, therefore, were negligent, but they were not intentionally fraudulent."

4. Traditionally the doctrine of unclean hands has required a finding of wrongful intent or wilful misconduct and mere negligent conduct has not sufficed. See e.g., Freeman Mfg. Co. v. Federal Department Stores Inc., 195 F.Supp. 951, 953 (D.Mich.1961); Helene Curtis Industries

In cases where the grant of a patent monopoly is involved a court may properly consider "both public and private standards of equity" in relation to a claim of unclean hands. Id. at 816, 65 S.Ct. at 998. It would therefore be warranted in not condoning behavior as reckless as that demonstrated on this record by an inventor who is invested with a public trust and whose oath, which is by statute an essential part of every patent application,[5] is heavily relied upon by the authorities in the Patent Office. But the appellants' argument does not apply with equal force to the claim of misappropriation of trade secrets which, as the court noted, is to a large degree a "separate matter." Tate's misconduct before the Patent Office in 1957 is only remotely related, if at all, to the defendants' breach of trust in 1960 and subsequent years. "[M]isconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands." Republic Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347, 349 (9 Cir. 1963). Especially as the courts of equity are, in the words of the Supreme Court in Keystone Driller Co. v. General Excavator Co., supra, 290 U.S., pp. 245–246, 54 S.Ct. 146, 148, not restrained in applying the clean hands maxim "by any limitation that tends to trammel the free and just exercise of discretion," and in view of the "wide range to the equity court's use of discretion," Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., supra, 324 U.S. at 815, 65 S.Ct. at 997, we are unwilling to say that the trial judge's decision in favor of the plaintiff was not permissible under the circumstances of this case.

■ Appellants also contend that, at the time this action was commenced, the plaintiff either knew or believed that the Marcan load cell, which is high ball, did not infringe the Tate patent which, they claim, is clearly limited to cells of the low ball type. For this they rely on the fact that Tate personally examined a Marcan cell prior to the commencement of this action, and was then of the opinion that it did not infringe his patent. The trial court refused to find that the plaintiff had acted with unclean hands on this basis, however, since, at the time the complaint was filed, Tate no longer held a position of executive responsibility in the plaintiff's management and he was therefore not consulted about whether or not to sue. The claim for patent infringement was included with that for theft of trade secrets only on the advice of plaintiff's counsel who, the court found, were then of the opinion that the Marcan load cell might be found to infringe claim 12 of the patent despite its high ball construction. The court further found that the attorneys' advice was given in good faith and that it represented their honest professional opinion at the time. This finding appears to have been based largely upon statements made by the attorneys in the course of the hearing which was held in connection with the defense of unclean hands and therefore would depend heavily upon the credibility given to them by the trial judge. It is also supported, however, by the fact that the theory upon which the attorneys then claimed that the charge of infringement had been based, i. e., the doctrine of equivalents,[6] was asserted by them at a very early stage in the litigation in their answers to certain interrogatories propounded by the defendants. While in its opinion the trial court expressed doubt as to the merit of the plaintiff's theory, we are satisfied that the equivalents doctrine [7] was at least suffi-

v. Sales Affiliates, 121 F.Supp. 490, 512 n. 70 (S.D.N.Y.1954).

5. 35 U.S.C. § 111.

6. Under the equivalents doctrine a device which does not correspond literally to the claims of a patent may nevertheless be held to infringe if it is the functional equivalent of the subject matter of the patent. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). See generally 3 Walker on Patents (Deller's ed. 1937) § 464 et seq.

7. A possible difficulty with the plaintiff's theory is that if the low positioning of

ciently pertinent to raise the question of whether the high ball cell infringed the plaintiff's patent. Moreover, the appellants have come up with no persuasive evidence that either the plaintiff or its attorneys were motivated by bad faith and there is certainly no basis for a holding that the trial court's conclusion to the contrary was clear error.

 Finally appellants contend that the plaintiff acted in bad faith when it failed to withdraw the claim of patent infringement after its attorneys learned in late 1963 of the sale of Emery cells to Pratt & Whitney and after they discovered evidence of the Hooker sales in plaintiff's files in April of 1964. It is not disputed that in December of 1963 the plaintiff did offer to withdraw the pending infringement charge with prejudice; but in return it demanded that the defendants agree to give up "any claims of any kind with respect to this patent and its appearance in this litigation." This was unsatisfactory to the defendants both because it left them without a judicial declaration of patent invalidity good against the world, and because it required the defendants to surrender their right to claim damages for what they consistently maintained was the intentional assertion against them of a baseless charge of infringement. When the Hooker sales were dis-

covered in April of 1964, the plaintiff made no concessions from its earlier position, despite the fact that, according to a subsequent statement of one of its attorneys, they knew "without question" at that time that the patent was invalid. But this must have been equally apparent to the defendants, whose counsel were immediately advised of the Hooker sales by counsel for the plaintiff. If the presence of the patent infringement charge in the litigation was such a damaging brake on the appellants' sales, as they now claim,[8] their obvious recourse was to move for summary judgment on their counterclaim of patent invalidity. Having failed to do so, they cannot now maintain that the plaintiff's failure to move for a formal dismissal of that part of its action was so inequitable as to bar the relief for theft of trade secrets to which it is otherwise entitled.

 We have reserved as the final point for discussion the undergirding issue of whether or not there was federal jurisdiction over the "pendent" state law claim for unfair competition, to which practically all of the evidence presented at the trial was directed, in view of the rather rapid evaporation at the trial of the patent infringement issue. The complaint asserted federal jurisdiction of the subject matter under 28 U.S.C. § 1338(a) and (b),[9] alleging both

the ball in the plaintiff's load cell constituted the advance over the prior art which made its device a patentable one (a fact not found in this case) then the plaintiff might not be able to resort to the doctrine of equivalents in order to expand the scope of the patent to include a cell of the high ball type which was a part of the prior art at the time the patent issued. See, e.g., Lunati v. Barrett, 104 F.2d 313 (6 Cir. 1939).

8. In the testimony taken at the hearing on unclean hands the trial court found "no convincing evidence" to support the defendants' claim that the patent charge was intentionally retained in the litigation by the plaintiff in order to exploit the competitive effect which it might have on Marcan's business. The evidence did suggest, however, that the patent litigation was at times mentioned to potential Marcan customers by representatives of the plaintiff, even after the discovery

of the Hooker sales. But the defendants did not affirmatively make this conduct a ground for relief in their counterclaim, as they might have, see Cutting Room Appliances Corp. v. Empire Cutting Machine Co., 186 F.2d 997 (2 Cir. 1951), and the trial court therefore made no findings on the extent of any damages which they may have suffered. As Judge McLean noted, they are nevertheless free to assert any remedy which is still available to them in an independent action against the plaintiff.

9. 28 U.S.C. § 1338(a) confers upon the district courts original jurisdiction of "any civil action arising under any Act of Congress relating to patents * * *." Section 1338(b) confers original jurisdiction "of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trade-mark laws."

a substantial patent infringement claim and a charge of theft of trade secrets, to which the infringement claim related. Although it was discovered before trial, but some time after the action had been brought, that sales had been made to Hooker, we conclude that the infringement charge alleged in the complaint was substantial, at the time the complaint was filed, for the purpose of § 1338(b), as that term is defined in the case law,[10] and that it sufficed to give the district court the power to entertain and decide the unfair competition charge of theft of trade secrets.

 But the existence of federal power does not mean that the trial court must or should exercise its jurisdiction in all cases where it in fact exists. As the Supreme Court made clear in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), whether or not it should do so in a particular case depends upon a variety of factors calling for the exercise of the sound discretion of the trial judge. In his opinion in this case, Judge McLean expressly considered the relevant factors of "judicial economy, convenience and fairness to litigants," id. at 726, 86 S.Ct. at 1139, and, despite the fact that the plaintiff had introduced no evidence in support of its patent infringement claim, determined that it was wiser to exercise federal jurisdiction than to "dismiss the claim at this late date and to compel the parties to litigate it anew in the state court."

 In its brief appellee states that the trial judge was informed during pre-trial conferences with the parties that the plaintiff "would offer no evidence relating to infringement in view of the prior use" established by the Pratt & Whitney and the Hooker sales. If this was so, then at that point, the proper procedure for the pre-trial judge to have pursued was to dismiss the plaintiff's infringement suit and declare the patent invalid pursuant to the defendants' counterclaim. This undoubtedly would have carried the trade secrets claim along with it. As the Supreme Court cautioned in *Gibbs*, supra, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 383 U.S. at 726, 86 S.Ct. at 1139. While we consider this precept as it may bear upon the present case, we are not of the opinion that Judge McLean abused his discretion in not dismissing the plaintiff's trade secrets claim for want of pendent jurisdiction. He made it quite clear that he was unaware, before the trial, that the plaintiff conceded its patent was invalid and that it intended to

10. The test of what is a "substantial" claim under § 1338(b) is the same as that applied in determining whether a claim should be dismissed for want of jurisdiction rather than on the merits in cases involving original federal question jurisdiction. See United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Note 80 Harv.L. Rev. 220, 224 (1966). An allegation invoking federal law is substantial unless it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction * * *." Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). See also Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105, 53 S.Ct. 549, 77 L.Ed. 1062 (1933); Binderup v. Pathé Exchange, 263 U.S. 291, 306, 44 S.Ct. 96, 68 L.Ed. 308 (1923); The Fair v. Kohler Die Co., 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913); Strachman v. Palmer, 177 F.2d 427 (1 Cir. 1949). While questions of federal power, of which substantiality is one, "will ordinarily be resolved on the pleadings," United Mine Workers v. Gibbs, supra, at 727, 86 S.Ct. at 1139, it is doubtful that a plaintiff could create "power" in the federal court over a claim of state law by including in the complaint a federal allegation which it knows at the time to be wholly frivolous and regarding which it never intends to present evidence at the trial. Although, as Emery concedes, this was so in the present case before the case went to trial in 1966, it was not true at the time the complaint was filed in 1962.

offer no evidence to support its claim of infringement. In its second opinion the court referred to the "aura of mystery" which surrounded the issue of patent infringement, but concluded that it could not be said that the plaintiff had actually misrepresented the facts to the court. In any event, the judge did not know of the status of the infringement issue until the trial was well under way. Under all the circumstances we conclude that the trial judge did not abuse his discretion in holding that the infringement of patent claim was substantial and related to the charge of unfair competition.[11]

The judgment of the district court is affirmed.

Hastie, Circuit Judge, dissented.

---

11. The complaint does not allege diversity of citizenship and in fact there was no complete diversity, as both the plaintiff and the defendant Mills are citizens of Connecticut. Had we decided that the trial court abused its discretion in exercising jurisdiction under § 1338(b), there might, nevertheless, be the possibility that, even at this late stage in the litigation, the complaint could be amended to cure the jurisdictional defect by dropping Mills as a party. See Finn v. American Fire & Casualty Co., 207 F.2d 113 (5 Cir. 1953), cert. denied, 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1069 (1954), But on the disposition made, we need express no opinion on the point.