**SHAMROCK TECHNOLOGIES, INC., Plaintiff,**

v.

**MEDICAL STERILIZATION, INC. and Robert S. Luniewski, Defendants.**

**No. CV 88–1681.**

United States District Court,
E.D. New York.

Oct. 23, 1992.

Brumbaugh, Graves, Donohue & Raymond, New York City (James J. Maune, Stanley D. Ference III, of counsel), for plaintiff.

Kane Dalsimer, Sullivan, Kurucz, Eisle and Richard, New York City (John Kurucz, of counsel), for defendants.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

Shamrock Technologies, Inc. ("Shamrock"), brought this action against Medical Sterilization, Inc. ("MSI"), and Robert S. Luniewski ("Luniewski") claiming: (1) patent infringement of patent No. 4,748,005 ('005' patent) issued May 31, 1988; (2) patent infringement of patent No. 4,777,192 ('192' patent) issued October 11, 1988; (3) misappropriation of trade secrets; (4) unfair competition arising from Luniewski's breach of his fiduciary duty as an employee and officer of Shamrock by disclosing confidential and trade secret information; and (5) Luniewski's breach of his employment contract by his disclosure of confidential and trade secret information.

In addition to denying the material allegations of the complaint, the defendants asserted affirmative defenses and counterclaims, challenging the validity of the patents in suit.

On August 8, 1989, in a memorandum of decision and order, this court granted Shamrock's motion for partial summary judgment, holding that patents '005' and '192' are valid and that "defendants' original and current processes infringe the claims of both patents." The United States Court of Appeals for the Federal Circuit affirmed this holding. 903 F.2d 789 (Fed. Cir.1990).

The undecided issues of fact were tried to the court without a jury. The court finds:

*Shamrock*

Robert B. Newberg joined Shamrock in 1959 and became its president. Prior to 1975, Shamrock was in the business of distributing products to consumers through retail channels, e.g., Endew to stop mildew. In 1975, Shamrock entered the business of processing polytetrafluoroethylene ("PTFE") for use in printing ink powders. Shamrock's gross sales started to expand with this new venture. It opened a plant in 1976 in Newark, New Jersey, and its business continued to grow. From a staff of six employees in 1959, Shamrock had more than 100 employees in 1992, and during the last few years Shamrock grossed between $20 million and $22 million a year.

*Radiation Dynamics, Inc. and Luniewski*

In 1958, Dr. Kennard Morganstern and Dr. Marshall Cleland organized Radiation Dynamics, Inc. ("RDI"), to design and manufacture electronic beam accelerators to be used in the radiation and preservation of food and drinking water. RDI established offices in Westbury, Long Island. RDI experimented in the use of electronic beam accelerators on PTFE to obtain a uniform product. In using the electronic beam, RDI used blenders for agitating and mixing the PTFE.

In 1968, RDI employed Luniewski as a salesman. He became the manager of RDI's facility for radiation processing. He was employed by RDI until March 1980, when he joined Shamrock. During his employment at RDI, Rodney Derbyshire conducted experiments on the irradiation of PTFE in a "Waring" blender and then in a gallon size blender. The experiments conducted by Derbyshire consisted of irradiating PTFE in a wet mixture of PTFE material and water and heating the mixture. These experiments resulted in the issuance of U.S. Patent No. 4,220,511 to Rodney Derbyshire.

When Luniewski joined Shamrock in 1980, the knowledge he acquired through Derbyshire's experiments were of no use in developing the Shamrock method of processing PTFE.

## Luniewski's Employment at Shamrock

When Luniewski joined Shamrock, he entered into a written employment agreement dated March 11, 1980, in which he agreed that he "will never directly or indirectly use, disseminate, disclose, lecture upon, or publish articles concerning any Confidential Information." (Ex. 25 ¶ 4). He also agreed that he would not claim that he had knowledge of inventions or ideas "or improvements thereof, or know-how related thereto, as having been made or acquired by him prior to his being employed by the Company...." (Ex. 25 ¶ 4(b)).

When Shamrock started processing PTFE into powders for use in the printing industry, the method of reducing PTFE to a fine powder for use in ink and paint was to expose the PTFE to radiation. The PTFE was arranged in trays on a compressor belt and irradiated. The method was inefficient since the upper layers received more radiation than the lower layers. In order to solve this problem, Shamrock experimented with the use of the electronic beam with a blender. The experimentation was conducted prior to Luniewski's employment at Shamrock. Luniewski was hired to pursue Shamrock's investigation into the use of the electronic beam in processing PTFE.

Experiments were conducted at High Voltage Engineering Corporation in Burlington, Massachusetts, on behalf of Shamrock, (in which Luniewski participated for more than a year). In July 1981, Shamrock installed a facility for the commercial production of PTFE.

## Shamrock's Trade Secrets and Patents

The Patent Office of the United Kingdom published U.K. Patent 2,119,385 to William B. Newberg (Shamrock's president) and Luniewski for "Apparatus and method for radiation processing of materials" on December 18, 1985. The application for the British patent was published on November 16, 1983. On May 3, 1982, the application for '005' was filed in the United States Patent Office and the patent was issued on May 31, 1988. The '005' patent duplicates the British patent.

The process used by Shamrock for producing PTFE in their plant, from about July 1981 to the time the process was improved by water injection as described in the '192' patent, employed the following system: A ribbon blender about six feet long, capable of holding a batch of material weighing 2,000 to 3,000 lbs.; a mechanical stirring mechanism to agitate the PTFE and expose it to the radiation source; a water cooling jacket to cool the material; a dust cover over the ribbon blender and a vent for removing dust from the vessel connected to a cyclone separator for recovering the dust; a supply of air to the material in the processing apparatus to fluidize the material, promote the degradation reaction, and promote cooling of the material. Protection for the process was set forth in the '005' patent claims.

Shamrock experienced difficulty in maintaining the material at the optimum temperature of 250° F. or below. Luniewski solved the problem by providing direct water injection during the radiation of the PTFE material. The application for the improved process was filed on July 22, 1983, listing Newberg and Luniewski as inventors and assigned to Shamrock. The patent was issued on October 11, 1988, as the '192' patent.

The '192' patent describes the problem Shamrock encountered in reducing the temperature of materials to about 250° F. in the process used prior to July 1983. It also describes Shamrock's discovery that adding water to the mixture actually increased the temperature of the material. The patent states:

> The temperature increase caused by the reaction of water is greatest when the material being processed is that known as virgin polytetrafluoroethylene. When that material is being processed, it has been found that water should be added to the vessel when the material reaches a temperature of about 260° F.

The patent then describes the time when water is to be added to different materials based on the temperature of the vessel. (See Col. 6, line 60 to Col. 70, line 33). The claims incorporate the method of supplying

water to the vessel at varying temperatures.

*Termination of Luniewski's Employment at Shamrock, and Employment at MSI*

MSI was organized in 1982 by Dr. Morganstern after he left RDI. MSI engaged in the business of sterilizing products and equipment, e.g., surgical instrument sets, before delivery to hospitals. It began its commercial operations in 1985.

In June 1983, Luniewski accepted an offer of employment at MSI. On July 29, 1983, Luniewski entered into a written agreement with Shamrock in which the parties agreed that Luniewski's employment at Shamrock "should be terminated" as of that date. Shamrock paid Luniewski the sum of $26,500. The contract provided: (a) $16,500 "in return for which Luniewski shall re-execute the Secrecy/Non–Competition Agreement originally executed by him and Shamrock on March 11, 1980," and (b) the sum of $10,000 for his acknowledgement of receiving all salary and all forms of monetary and non-monetary compensation due him.

MSI had invested a substantial sum in an electron beam accelerator (approximately $5 million) to be used in the business of the corporation. Luniewski was hired by MSI to install the electron beam accelerator and manage the radiation facility at MSI. His employment at MSI commenced soon after the termination of his employment at Shamrock on July 29, 1983.

MSI's business encountered difficult times. Shamrock was unable to satisfy the demand for its product. Shamrock contracted with others for the processing of the raw material into PTFE powder. RDI had processed PTFE for Shamrock (using the tray method).

On June 30, 1986, MSI began processing PTFE. Shamrock contracted with MSI for processing PTFE on occasion by shipping the raw material to MSI. On January 9, 1987, Shamrock shipped a quantity of raw material to MSI for processing. Shamrock learned that 2,000 lbs. of the material was not returned to it. Shamrock suspected that MSI was using the unreturned material for its own use in competition with Shamrock.

In an attempt to avoid liability for infringement of the '005' and '192' patents, MSI and Luniewski formed a company doing business as Precision Micron Powders which engaged in the sale of PTFE to Shamrock's major customers. Thereafter, in November 1987, Precision Micron Powders ("PMP") was incorporated and continued to sell PTFE powder to Shamrock's customers.

MSI processed PTFE from on or about June 30, 1986, to September 1989 (preliminary injunction issued August 8, 1989) using the process employed by Shamrock as revealed in the issuance of the '005' and '192' patents. MSI acquired the information for installation and use of the equipment from Luniewski, who had acquired it during his employment at Shamrock from March 11, 1980, to July 30, 1983.

*Luniewski's Disclosure of Trade Secrets*

Shamrock claims that Luniewski breached his fiduciary duty to Shamrock by disclosing its method and apparatus for processing PTFE. Shamrock claims that prior to the issuance of the '005' patent (May 31, 1988) and the '192' patent (October 11, 1988), the use by MSI of Shamrock's method and apparatus caused Shamrock substantial loss of business.

A trade secret is defined as "any formula, pattern, device or compilation of information that is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement of Torts § 757 cmt. b (1937).

Among the factors to be considered in determining whether a particular process is a trade secret are the degree of secrecy surrounding the process both within and without the plaintiff's business, the efforts expended by the plaintiff to develop the process and preserve its secrecy, the value of the process to the plaintiff and its competitors, and the difficulty with which the process could be duplicated by others.

*Rapco Foam, Inc. v. Scientific Applications,* 479 F.Supp. 1027, 1029 (S.D.N.Y.

1979); *see Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 375 (S.D.N.Y.1989), *aff'd*, 920 F.2d 171 (2d Cir.1990).

Defendants deny liability based on Luniewski's disclosure to Shamrock, asserting that: (1) Luniewski knew of the process through his work at RDI and his participation in experiments conducted by Rodney Derbyshire, resulting in the grant of Patent No. 4,220,511; (2) Shamrock failed to "protect its trade secrets with the safeguards required by law" (Defendants' Post–Trial Brief, p. 22) [1]; and (3) the publication of the British patent on November 16, 1983, terminated the trade secret which was incorporated in the patent.

*Luniewski's Knowledge*

We find that Luniewski had no knowledge of the process that established the trade secret prior to his employment at Shamrock.

■ A trade secret is not to be denied a manufacturer because the components or a combination of some of the components are in the public domain. The test is whether the manufacturer, by combining all of the components, has developed a system or process that affords a competitive advantage. *Imperial Chemical Indus., Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965). Nor is the failure of Shamrock to require secrecy or confidentiality agreements to maintenance people and visitors a failure to take reasonable precautions to maintain secrecy. The employment relationship established the fiduciary relationship. *See Integrated Cash Mgmt. Serv., Inc.*, 920 F.2d at 173. Luniewski's knowledge of the use of the stainless steel ribbon blender under an electronic beam at HVE in irradiating PTFE, prior

to his employment at Shamrock, does not deny Shamrock trade secret protection because such equipment is part of Shamrock's process. *Id.*, at 174.

*Preservation of the Trade Secret*

■ Not every disclosure extinguishes the right to a trade secret. The owner is required to take reasonable precautions to guard the secret. *E.I. duPont de Nemours & Co. v. Christopher*, 431 F.2d 1012, 1015–16 (5th Cir.1970), *cert. denied*, 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971). Secrecy is a relative term. *K–2 Ski Co. v. Head Ski Co.*, 506 F.2d 471, 474 (9th Cir.1974) ("the entirety of the circumstances surrounding the use of the secret" must be considered); [2] *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir.), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968).[3] The entry of maintenance people and visitors into the E–Beam vault did not disclose the Shamrock process for producing PTFE powder.

*The U.K. Patent*

■ Defendants claim that the availability for inspection of the British patent on November 16, 1983, and the issuance of the patent on December 18, 1983, terminated Shamrock's right of secrecy. In the memorandum submitted by defendants, they cite Second Circuit Court of Appeals decisions for the general principle that trade secret rights terminate upon the issuance of a patent revealing the claims upon which a trade secret is established. *Defiance Button Mach. Co. v. C. & C. Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *Timely Prods. Corp. v.*

---

**1.** This argument is based on defendants' proposed findings of fact, (¶¶ 40, 41 and 44) which states that Michalowski participated in the installation of the electron beam facility and was not required to sign a secrecy or confidentiality agreement, and that maintenance people and visitors entered the E–Beam vault and were not required to sign secrecy or confidentiality agreements or a visitors' log.

**2.** In *K–2 Ski Co.*, the owner of the secret permitted limited tours of the plant but "during these

tours, it was impossible to discover the K–2 procedure." 506 F.2d at 474.

**3.** In *Emery*, plaintiff circulated parts of drawings to certain of its customers and to various members of the trade. The court held "[e]ven though parts of drawings may on occasion have been shown to a limited number of outsiders for a particular purpose, this did not in itself necessarily destroy the secrecy which protected them before they were disclosed." 389 F.2d at 16.

*Arron*, 523 F.2d 288, 304 (2d Cir.1975) (citing *Conmar Prods. Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150, 155 (2d Cir.1949)). Shamrock, in response, cites *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir.1953), holding that when a trade secret is revealed in breach of a confidential duty and not through publication, the prior publication is not an answer to the claim.[4]

In *Conmar*, the court held that the disclosure of the trade secret in the issuance of a patent terminates the right in the trade secret, and the wrong-doer has the same right to its use that is afforded any member of the public. *Conmar Prods. Corp.*, 172 F.2d at 155. The court noted in *Conmar:*

> Conceivably an employer might exact from his employees a contract not to disclose the information even after the patent issued.... We agree with the Restatement that each case must stand on it's facts.

*Id.* at 156. The court in *Conmar*, however, noted that the Sixth Circuit[5] and the Seventh Circuit[6] had held to the contrary.

The principle announced in *Conmar* was reaffirmed in *Timely Prods. Corp.*, 523 F.2d at 304. In *Adolph Gottscho, Inc. v. American Marking Corp.*, 18 N.J. 467, 114 A.2d 438, (1955), the court rejected the defendants claim that the issuance of the patent "constituted public disclosures which automatically terminated the plaintiff's pre-existing cause of action against him and the Marling Corporation to the extent that it related to secrets disclosed by the patents. Although there are decisions which suggest support for his position, we believe that reason, and the weight of authority are to the contrary." *Adolph Gottscho, Inc.*, 18 N.J. at 472, 114 A.2d 438.

The employment agreement provided that Luniewski would "never directly or indirectly, use, disseminate, disclose, lecture upon, or publish articles concerning any confidential information." (¶ 4). In the termination agreement, Luniewski acknowledged that payment of the sum of $16,500.00 was in considerations for his reaffirming "the Secrecy/Non–Competition Agreement originally executed by him and Shamrock on March 11, 1980."

■ We find that under the facts of this case, Luniewski's agreement never to disclose the information, sustains Shamrock's claim despite the disclosure by the British patent. We further find that since the British patent did not disclose the improved procedure under the '192' patent, the use of that procedure violated Luniewski's obligation not to reveal it. Since Luniewski's position at MSI gave him authority to make policy with reference to the use of the procedure for processing PTFE, Medical Sterilization, Inc., is also liable for the appropriation of the trade secret.

We believe that New Jersey substantive law applies. Under *Adolph Gottscho*, Shamrock has established its claim for appropriation of its trade secrets against Luniewski and MSI.

### Willful Infringement

Shamrock asks the court to increase patent infringement damages three times, 35 U.S.C. § 284, on the ground that the infringing activities were willful and committed in bad faith.

■ In determining the issue of willfulness, the court examines the totality of the circumstances. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 867 (Fed.Cir. 1985); *Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1390 (Fed.Cir.1983). In *Read Corp. v. Portec*,

---

**4.** *Franke* states in pertinent part:
 It matters not that the defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is they did not. Instead they gained it from plaintiffs via then confidential relationship, and in doing so incurred a duty not to use it to plaintiffs' detriment. This duty they have breached.

*Franke*, 209 F.2d at 495.

**5.** *A.O. Smith Corp. v. Petroleum Iron Works Co.*, 74 F.2d 934, 935 (6th Cir.1935).

**6.** *Shellmar Products Co. v. Allen–Qualley Co.*, 87 F.2d 104 (7th Cir.1936).

*Inc.,* 970 F.2d 816 (Fed.Cir.1992), the court noted:

The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances. The court must consider factors that render defendant's conduct more culpable, as well as factors that are mitigating or ameliorating.

970 F.2d at 826 (citations omitted).

Defendants claim they had a good faith belief that the patents were invalid because: (1) the Derbyshire patent disclosed the inventions claimed in the '005' patent and the '192' patent; (2) the process was developed at RDI; (3) work with the ribbon blender by Michalowski was done while Luniewski was at RDI; (4) Dr. Morganstern, an expert in this art, did not believe the patents were valid; and (5) upon learning of the issuance of the '005' patent, the defendants sought and received legal advice upon which they relied.

We have found that although RDI had experimented with the use of the electronic beam and a ribbon blender, neither Michalowski nor Luniewski knew of the process developed by Shamrock. We further found that the Derbyshire patent did not anticipate the '005' invention. We are called upon to look at the totality of the circumstances.

■ We first observe that when Luniewski left Shamrock in July 1983 to join MSI, and thereafter, breached his agreement not to reveal trade secrets. Such faithless conduct did not preclude a good faith belief that the patent that incorporated the trade secret was invalid.

Dr. Morganstern had a good faith belief that the Shamrock process which MSI used prior to the issuance of the '005' patent on May 31, 1988, was simply a method of using the electronic beam to get a uniform mixture.

Prior to the issuance of the '005' and '192' patents, Dr. Morganstern and Luniew-

ski had a good faith belief that the applications would be denied.

Shamrock filed its complaint charging infringement of the '005' patent on the day it was issued, i.e., May 31, 1988. Soon after service of the complaint, Dr. Morganstern sought the advice of John Kurucz, Esq., of the firm of Kane, Dalsimer, Sullivan, Kurucz, Eisle and Richard.

Mr. Kurucz's issued an opinion letter dated June 9, 1988, addressed to Dr. Morganstern as president of MSI (Ex. E). The opinion expressed doubt as to the propriety of issuing the patent in the names of Luniewski and William B. Newberg, who "is not a co-inventor." He further advised Dr. Morganstern that "there exists a meritorious defense of noninfringement" in "that MSI does not employ a water cooling jacket nor does it cool the vessel." He further expressed the opinion that "patent infringement could be clearly avoided by substituting air agitation for mechanical stirring and air cooling for water cooling."

On June 27, 1988, Kane Dalsimer by Kurucz, interposed an answer on behalf of defendants which asserted affirmative defenses challenging the validity of the '005' patent and infringement. The answer also contained a counterclaim seeking judgment declaring the '005' patent invalid and noninfringement of any valid claim. This court's memorandum of decision and order dated October 13, 1988, struck the affirmative defenses and counterclaim.

The answer interposed to Shamrock's supplemental complaint[7] was filed on March 7, 1989. The answer asserted affirmative defenses challenging the validity of the '192' patent and a counterclaim seeking judgment declaring the '192' patent invalid and noninfringed.

The Circuit Court affirmed this court's memorandum of decision and order dated August 8, 1989, holding that the '005' patent and the '192' patent was valid and enforceable and that the MSI process used in producing PTFE infringed the claims of both patents. 903 F.2d 789 (Fed.Cir.1990).

---

**7.** The supplemental complaint added Count 2 to the First Cause of Action alleging infringement of the '192' patent.

Kurucz's lack of success in establishing the invalidity and/or noninfringement of the patents is not the test of willfulness. "An honest opinion is more likely to speak of probabilities than certainties." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 829 n. 9 (Fed.Cir.1992). Defendants had a right to rely on the advice of an experienced patent attorney in defending the action. The fact that the advice turned out to be erroneous does not support a finding of willfulness. *Datascope Corp. v. SMEC Corp.*, 879 F.2d 820, 828 (Fed.Cir. 1989).

> Willfulness is a determination as to a state of mind. One who has actual notice of another's patent rights has an affirmative duty to respect those rights. That affirmative duty normally entails obtaining advice of legal counsel although the absence of such advice does not mandate a finding of willfulness. Those cases where willful infringement is found despite the presence of an opinion of counsel generally involve situations where opinion of counsel was either ignored or found to be incompetent.

*Read Corp.*, 970 F.2d at 828–29 (citations omitted).

Shamrock has failed to establish willful infringement. The request for increased damages under 35 U.S.C. § 284 is denied. We also deny Shamrock's request for attorney fees under 35 U.S.C. § 285.

## DAMAGES

### Trade Secret Violation

The parties agree that during the period from February 1, 1986 to May 31, 1988, MSI sold PTFE products, using Shamrock's process, to Shamrock's customers and others in the amount of 363,283 lbs.: 234,533 lbs. to customers of Shamrock (compounders),[8] and 128,750 lbs. to others.

Shamrock claims as damages the profit it lost through MSI's sales to its customers (Ampac, Dyall and Caroll), and the profit MSI made on the sales to others who were not Shamrock's customers.

### Sales to Compounders (Shamrock Customers)

We find that the sales MSI made to Shamrock's customers would have been made by Shamrock had MSI not displaced Shamrock as their supplier.

Shamrock's loss of PTFE sales to its customers, as a result of MSI violation of Shamrock's trade secret and patent rights, was as follows:

### PURCHASE OF PTFE
(Thousands of Pounds)

| | | SHAMROCK | MSI/PMP/ DAIPOLYMER |
|---|---|---|---|
| AMPAC | 1986 | 199.8 | –0– |
| | 1987 | 230.9 | 32.1 |
| | 1988 | 35.8 | 439.1 |
| | 1989 | –0– | 595.5 |
| DYALL (LAUTER) | 1986 | 277.2 | –0– |
| | 1987 | 345.8 | 19.0 |
| | 1988 | 309.6 | 157.4 |
| | 1989 | 204.4 | – |
| CAROLL | 1986 | 219.7 | –0– |
| | 1987 | 233.0 | –0– |
| | 1988 | 385.4 | 53.0 |
| | 1989 | 201.2 | – |

**8.** Defendants organized PMP and Daipolymer. Orders received by MSI were filled by these entities in an attempt to conceal the method of distribution.

Lost profits is the difference per lb. of average cost (which includes cost of materials, cost of processing, and overhead) and average selling price per lb. (Tr. p. 187, Shade), i.e., the average cost per lb. during the period from February 1, 1989, to January 31, 1990, was $3.91. (Tr. p. 191, Shade).[9]

■ Defendants argue that the standard for assessing compensatory damages for trade secret violation and patent infringement is a reasonable royalty on the amount sold. Defendants suggest a reasonable royalty is ½ cent a pound.

■ In claims for misappropriation of trade secrets and patent infringement, plaintiff's damages are based on lost profits resulting from a violation of those rights. *A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 87 (2d Cir.1991) ("The amount of damages recoverable in an action for misappropriation of trade secrets may be measured either by the plaintiff's losses [citations omitted] or by the profits unfairly received by the defendant [citation omitted]"); *Electro–Miniatures Corp. v. Wendon Co., Inc.,* 771 F.2d 23, 27 (2d Cir.1985) (misappropriation of trade secrets); *Milgo Electronic v. United Business Communications, Inc.,* 623 F.2d 645, 662 (10th Cir. 1980), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Lost profits is an appropriate standard where the plaintiff uses the process appropriated by defendant. *Devex Corp. v. General Motors Corp.,* 667 F.2d 347, 351 (3rd Cir.1981), *cert. denied,* 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982) (patent infringement claim).

In *Electro–Miniatures,* the court held:

It is true that EMC had the burden of proving its damages with reasonable certainty, *see Yentsch v. Texaco, Inc.,* 630 F.2d 46, 59 n. 19 (2d Cir.1980), but it was not obligated to offer a mathematically precise measure of those damages. Where, as here, there is a clear showing

of injury that is not susceptible to exact measurement because of the defendant's conduct, the jury has some latitude to "make a just a reasonable estimate of damages based on relevant data." *Bigelow v. R.K.O. Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

*Electro–Miniatures,* 771 F.2d at 27. "[I]t will be enough if the evidence shows the extent of the damage as a matter of just and reasonable inference, although the result be only approximate.... [T]he risk of uncertainty should be thrown upon the wrongdoer instead of upon the injured party." *Milgo Electronic,* 623 F.2d at 664–65 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931)).

The sale to compounders took place during the period from February 1, 1987 to May 31, 1988. We find the fair and reasonable rate of lost profit is $1.80 per pound. Shamrock lost the sale of 234,533 lbs. to its customers by reason of the misappropriation by defendants of its trade secret. Shamrock is awarded the sum of $422,-159.40, representing lost profits to Shamrock.

We turn to the computation of profits that defendants unjustly received through sales of PTFE made during the period February 1, 1986, to May 31, 1988, to purchasers other than Shamrock's customers. Shamrock claims that defendants profited during the period at the rate of $1.49 per pound to $1.96 per pound.

Defendants suggest that their profit is in the range of 6½ cents per pound in 1986 to 8⅕ cents per pound in 1989.

We find that the average profit to defendants on sales to others during the period February 1, 1986, to May 31, 1988, was $1.54 per pound. This finding is based on Luniewski's testimony. Luniewski stated that the manufacturing cost was $3.71 per pound.[10] He testified that the average sell-

---

9. Shade testified that Shamrock produces 20 to 30 PTFE products and that cost varies in the production of the various products. (Tr. p. 193 Shade).

10. Luniewski stated: "In that $3.71 we have a raw material cost of about 2.50 cents per pound, a processing cost of 41 cents per pound, and those are the costs from here to here, and an

ing price was "between $5.00 and $5.50 a pound." (Tr. p. 457). Averaging the selling price at $5.25 per pound would show a profit to defendants of $1.54 per pound. Sales to others amounted to 128,750 lbs. Shamrock, therefore, is awarded the sum of $198,275, representing profits unjustly received by defendants from sales of PTFE made to others.

*Patent Infringement*

Shamrock seeks damages based on a royalty rate or lost profit on sales during the period June 1, 1988, to August 31, 1989, of 1,270,462 lbs. of PTFE to compounders and others. Of this amount, 202,382 lbs. is attributable to others and not compounders; Shamrock seeks a reasonable royalty on the 202,382 lbs. sold to others.

Defendants claim that the period terminated on August 21, 1989, when they claim the infringement ceased and MSI used the tray method of processing PTFE. They ask the court to reduce the amount subject to damages by 74,381 lbs.[11] We find that MSI ceased infringing on Shamrock's patent rights on August 21, 1989. The total amount of PTFE sold by MSI was 1,196,081 lbs. (999,100 lbs. sold to compounders and 196,981 lbs. sold to others). Moreover, we find that Shamrock lost profit on 999,100 lbs. that MSI sold to compounders at $2.00 per pound. Shamrock, therefore, is awarded the sum of $1,998,200 against defendants, which said sum represents the profits Shamrock lost through MSI sales of PTFE powder to Shamrock's customers.

 Shamrock seeks a royalty rate of 85.4 cents per pound on the 196,981 lbs. MSI sold to others. Defendants contend that 2 cents per pound is a reasonable rate. Shamrock's request is based on negotiations with RDI for licensing the use of the process set out in the Derbyshire patent. The proposed agreement (Ex. 49), discussed

in 1980, provided for a royalty of 30 cents per pound (¶ 8(b)), plus "30 cents per pound for each pound of PTFE materials processed within the scope of the licensed process and *practical know-how,*" (¶ 8(c) emphasis added). Shamrock interprets the agreement as providing for a 60 cent per pound royalty and converts that rate to current dollar value. At the time of the negotiations, Dr. Morganstern was chairman of RDI. As chairman, we infer that Dr. Morganstern was aware of RDI's negotiations and, in particular, its position with the royalty rate for processing PTFE under the Derbyshire patent.[12]

 In the absence of proof of reasonable royalty rate in the industry, we consider "the nature of the invention, its utility and advantages and the extent of the use involved." *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,* 235 U.S. 641, 648, 35 S.Ct. 221, 224, 59 L.Ed. 398 (1915). We also consider the use MSI made of the process in competing with Shamrock. *See Georgia Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1121 (S.D.N.Y.1970), *modified and aff'd,* 446 F.2d 295 (2d Cir.1971) (citing *Dowagiac Mfg. Co.,* 235 U.S. 641, 35 S.Ct. 221 and *United States Frumentum Co. v. Lauhoff,* 216 F. 610 (6th Cir.1914)).

We find "as a matter of just and reasonable inference," *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 561, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), that the reasonable royalty rate is 30 cents per pound on 196,981 lbs., i.e., the sum of $59,094.30. Shamrock, therefore, is awarded the sum of $59,094.30 against defendants for the sale to others for the period June 1, 1988 to August 21, 1989.

*Prejudgment Interest*

35 U.S.C. § 184 provides, in pertinent part:

---

overhead number of 80 cents per pound." (Tr. p. 432).

**11.** The court's memorandum of decision and order, granting Shamrock's motion for summary judgment and granting a preliminary injunction, was made and entered on August 8,

1989, and partial final judgment entered August 24, 1989.

**12.** Shamrock waives any claim to damages based on profits MSI unjustly received (because it does not have direct evidence of having lost this small percentage of sales) and relies on the royalty rate per pound.

Upon finding for the claimant the court shall award the claimant damages to compensate for the infringement ... together with interest and costs as fixed by the court.

See *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1250 (Fed.Cir.1989); *Lummus Industries, Inc. v. DM & E Corp.*, 862 F.2d 267, 274 (Fed.Cir.1988). Consequently, interest is awarded on the sum of $2,057,-294.30 (total sum of $1,998,200.00 and $59,-094.30) from August 21, 1989 at the rate of 1½% above the prime rate.

### ORDER

The Clerk is directed to enter judgment in favor of plaintiff Shamrock Technologies, Inc., and against defendants Medical Sterilization, Inc., and Robert S. Luniewski in the amount of $2,677,728.70, together with interest on the sum of $2,057,294.30 at the rate of 1½% above the prime rate from August 21, 1989.

SO ORDERED.

This memorandum of decision contains findings of fact and conclusions of law required under Fed.R.Civ.P. 52(a).